**Harpal Singh CHEEMA; Rajwinder Kaur, Petitioners,**

v.

**John ASHCROFT, Attorney General, Respondent.**

No. 02–71311.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 9, 2003.

Filed June 24, 2004.

Amended Aug. 6, 2004.

Second Amendment Sept. 8, 2004.

---

Robert B. Jobe, San Francisco, CA, for the petitioners.

Ethan B. Kanter, Department of Justice, Office of Immigration and Litigation, Washington, D.C., for the respondent.

Ravinder S. Bhalla, Krovatin & Associates, LLC; Newark, NJ, for amicus curiae the Sikh Coalition.

Before NOONAN, McKEOWN, and RAWLINSON, Circuit Judges.

## ORDER AND AMENDED OPINION

NOONAN, Circuit Judge.

### ORDER

The opinion filed on June 24, 2004, and amended on August 6, 2004 is amended as follows:

At slip. op. page 10535, delete the paragraph that begins with "As the Board did not complete ...", and replace with "Because the Board erred in determining whether Cheema was a "danger to the security of the United States," we remand to the Board to make that determination using the correct inquiry. *INS v. Ventura*, 537 U.S. 12, 17, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002)."

At slip. op. page 10535, in the paragraph that begins with "2. *Asylum* ...", delete the following sentence: "As the Board did not reach the exercise of its discretion, we remand so that it may do so."

Judge Rawlinson takes no position on the amendments.

### OPINION

Harpal Singh Cheema (Cheema) and his wife Rajwinder Kaur (Kaur) petition for review of an order of the Board of Immigration Appeals (the Board) denying them asylum and the withholding of deportation and holding them eligible for relief under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) but granting them only deferral of removal. We hold that the Board's denial of withholding and asylum for Rajwinder Kaur cannot be sustained because of the lack of any evidence that reasonable grounds exist to believe that she is a danger to the security of the United States. We remand to permit the Board to exercise discretion on the withholding and asylum petitions of Cheema. We sustain the Board's deferral of removal for both Kaur and Cheema and its denial of full relief to Cheema under CAT.

### FACTS

Cheema is a Sikh, born in India in 1958. He is a lawyer and a member of the Sikh Lawyers Association. In 1987, he helped to organize an enormous rally to protest the government of India's decision to divert water from the Punjab. Shortly after this public event, Indian police arrested Cheema, beat him with a wooden stick, and stretched his legs apart until the muscles began to break. He was released ten days later without charges.

In the aftermath in 1987, Cheema gave food and shelter to Gurjeet Singh and Charanjit Singh Channi, whom he describes as leaders in the All India Sikh Student Federation, an organization he describes as nonviolent. The government in its brief characterizes these two men as "well-known terrorists," although its citations to the record showing them to be leaders do not support the characterization of them as terrorists. In January 1989, Cheema was arrested and questioned as to

their whereabouts. When he was unable to say, he was taken into the jail yard, stripped, bound, stretched repeatedly on a pulley, and finally subjected to a solid steel roller being rolled over his thighs, breaking the muscles and causing him to lose consciousness. The next day he was again tortured on the pulley. Twenty days after his arrest he was released without charges. He was unable to walk and was hospitalized for a month.

In May or June of 1989, Cheema was again arrested and taken to Amritsar for interrogation. He was beaten and his right leg broken by his police interrogators. He was brought before a magistrate, who ordered him taken to a hospital where his broken leg was set, but on remand to police custody the police broke it again. After three months in a jail hospital, he was discharged from custody. Charges against him were withdrawn.

In August 1990, Cheema fled to Canada and, two months later, entered the United States. He joined the Sikh Youth of America, described by him as supporting the Sikh movement for an independent Khalistan and "very much against any kind of violence." He was elected general secretary of this organization in 1991. Later in 1991, he helped organize the Khalistan Affairs Center, a lobbying office in the United States for the Sikh cause of independence from India.

The Sikh Student Federation in India splintered in 1986 into a peaceful and a militant group, the latter being led by Daljit Singh Bittu and being known as SSB, Bittu. Cheema knew Bittu as a student in India. In 1983, Bittu became wanted by India for bank robbery and assassination. Cheema was contacted by him by telephone from Pakistan in 1996. Thereafter they spoke often about the independence movement, its need for a newspaper and a radio station, and the desirability of informing the United Nations about Indian atrocities in the Punjab. Cheema told Bittu that militant operations had greatly damaged the movement. Cheema took calls from individuals in India and connected them with Bittu in Pakistan. In October 1991, a Sikh connected with the kidnaping of Liviu Radu, the Romanian ambassador to India, called Cheema, who eventually put the caller in touch with Bittu. Cheema told Bittu that the kidnaping was objectionable, and Bittu told him that he had spoken to the kidnappers and they would release Radu unharmed, as they did.

Between 1990 and 1992, Cheema raised money in the United States to be sent to individual families that had suffered in the Punjab and to individuals injured in crossfire while trying to cross the border between Pakistan and India. If someone wanted "to send money to Pakistan," Cheema told them to contact Bittu, and he gave such potential donors Bittu's telephone number. Cheema himself did not handle any money, and he assured potential donors that their money would not go toward militant activities.

In February 1992, Cheema learned that his wife, Rajwinder Kaur, still in India, was ill. He returned and was seized by the police on his arrival at Bombay airport and flown to Delhi. He was shackled, blindfolded and interrogated about his activities in the United States. The next day the police applied electric currents to his tongue, lips, nostrils, and temples. He was then racked again by pulley. Three weeks later he was handed over to the Punjab police, again tortured by electricity and subjected to a mock execution. His mother, when allowed to visit him, could not recognize him. Three months later he was released on bail.

Cheema remained in hiding in India until May 1993, when he flew to New York

City with his wife. Prior to 1993, Cheema had never had any conversation with the head of the militant Khalistan Commando Force, Paramjit Singh Panjwar. In 1995, after two bomb blasts in the Punjab, Cheema called Panjwar to see if he was responsible. When he denied involvement, Cheema spread his denial through the media. Thereafter, approximately once a month until September 1997, Cheema talked by telephone to Panjwar. In 1995, Cheema aided the escape from India to Germany of Panjwar's wife, who was not a militant. In the same year, Cheema sent $5,000 to Panjwar's grandfather in India to pay for heart surgery.

In 1991 and in 1997, Cheema raised money for the Sikh Defense Fund, which offered legal assistance to Sikhs detained in North America. In 1995 and 1996, he raised $25,000 for the United Sikhs Defense Committee, a similar organization. He also sent money to Akal Academy, a Sikh temple in Kathmandu, and to a school for the blind in Delhi. He has helped support three Sikh activists for human rights.

Rajwinder Kaur testified that since coming to the United States in 1993 she has sent money to aid Sikh widows and orphans. According to her, she has never engaged in providing financial or other support for Sikh militants, and she is not aware of her husband doing so. The government did not present any evidence contradicting this testimony.

## PROCEEDINGS

On arrival in the United States in May 1993, Cheema and his wife were paroled into the country, but not admitted. In November 1993, in the first of twenty-six hearings before Immigration Judge Dana Marks Keener, they applied for asylum and withholding of deportation under the statute and for relief under CAT. Part of the INS's evidence in opposition consisted of classified information and testimony by government employees; this classification prevented its disclosure to the petitioners. The immigration judge held this evidence to be admissible under 8 C.F.R. § 240.33(c)(4). The judge ordered the government to present any exculpatory evidence it had. None was produced. The judge found it "inconceivable that, in the classified evidence that has been collected on Mr. Cheema, there is no evidence supporting his position." The judge went on to say: "Because of this fact, among others, the classified evidence must be viewed with respectful scepticism." Nonetheless, the judge did note that she drew inferences from this evidence.

On the key question of credibility, the judge found both petitioners fully credible as to what happened to them in India. The judge described Cheema as "an impressive witness. He is intelligent, thoughtful, well-spoken and sincere." The judge stated that his wife "was also a convincing witness. Her testimony was detailed, consistent, and plausible."

The judge did not believe some of Cheema's testimony regarding his fund raising in the United States. The judge softened her findings by observing as to Cheema's denial of fund raising for terrorists: "His decision to view this action through rose-colored glasses is a rationalization, not an outright lie."

Based on this evaluation of the testimony of the petitioners and many other witnesses, the judge found Rajwinder Kaur not to have engaged in terrorist activity and to be entitled to asylum, to withholding of deportation, and to full relief under CAT. The judge in the exercise of her discretion denied Cheema asylum because of his "lack of candor." The judge ruled that Cheema was entitled to withholding of

deportation, a nondiscretionary form of relief, but was seemingly barred this relief as a danger to the security of the United States because he had engaged in terrorist activities. The judge, however, found that this bar was subject to discretionary waiver under the Immigration and Nationality Act ("INA") § 243(h)(3) as amended by the Anti–Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") § 413(f).

The judge held the waiver to be applicable and that, "to ensure compliance with the 1967 United Nations Protocol Relating to the Status of Refugees," Cheema was entitled to withholding of deportation. The judge found that Cheema also qualified for relief under CAT, but not full relief as under CAT the bar raised by the finding as to terrorist activity could not be waived. Significantly, the judge found neither Cheema nor his wife to be a danger to the security of the United States.

Both the INS and petitioners appealed to the Board.

On appeal, the Board began by praising and adopting the immigration judge opinion as follows:

> The Immigration Judge's decision sets out the facts of this case in a thorough and meticulous manner. We commend the Immigration Judge on conducting a thorough hearing in this complex and difficult case, and then issuing an exceptionally well-written decision. Because the facts of this case are not in dispute, but rather how those facts and the applicants' actions and motives are to be interpreted, we will not restate the facts as part of our decision. We adopt and incorporate the Immigration Judge's factual findings found in her written decision from pages 1 though 43.

The Board went on to add: "Our decision in this case is based solely on the non-classified evidence of record." The Board noted several issues documented in the record which "raise concerns with regard to Mr. Cheema's credibility." After discussing these issues and the immigration judge's finding that Cheema was credible, the Board concluded that the judge's "credibility finding is supported by the record and we will not disturb it."

The Board found that Cheema had been brutally tortured by Indian authorities and that he "is one of the few prominent pro-Khalistan leaders in the world who would be in danger if returned to India." The Board accepted expert testimony that, as his wife, Rajwinder Kaur would also more likely than not be tortured if returned to India.

The Board did not disturb the findings that Cheema and his wife were entitled to withholding of deportation under INA § 243(h)(1) as well as under CAT unless barred by other provisions as to terrorists. The Board held that Cheema had engaged in terrorist activity "by soliciting funds for individuals and groups, i.e. Bittu and Panjwar, that he knew or reasonably should have known or at least had reason to believe had committed terrorist activity;" and that Cheema had given material support to Bittu and Panjwar by connecting calls to them from Sikh militants. The Board further found that his wife had engaged in terrorist activity "by sending money to various Sikh groups ... she knew or reasonably should have known or had reason to believe had committed or planned to commit terrorist activity."

Contrary to the conclusions of the immigration judge, the Board held that these findings barred withholding of deportation, because the acts of financial support for terrorist persons or groups in India and the facilitation of telephone calls from such persons in India were acts such as to "necessarily endanger the lives, property and welfare of United States citizens and

compromise the defense of the United States." The Board also held that the petitioners could not be granted withholding of deportation under CAT but only deferral of removal.

Cheema and his wife appeal.

## ANALYSIS

We do not find it necessary to consider the government's use, in the case before the Immigration Judge, of classified material not made available to the petitioners. For the purposes of this decision, we accept the Board's disavowal of consideration of this material.

### A. STATUTORY FRAMEWORK

1. *Withholding of Deportation.* INA § 241(a)(4)(B) renders deportable "[a]ny alien who has engaged, is engaged, or at any time after entry engages in any terrorist activity (as defined in § 212(a)(3)(B)(iii))."

"Terrorist Activity" is defined in INA § 212(a)(3)(B)(iii) as:

[T]o commit an act that the actor knows, or reasonably should know, affords material support, including a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training—

(aa) for the commission of a terrorist activity;

(bb) to any individual who the actor knows, or reasonably should know, has committed or plans to commit a terrorist activity;

(cc) to a terrorist organization described in clause (vi)(I) or (vi)(II); or

(dd) to a terrorist organization described in clause (vi)(III), unless the actor can demonstrate that he did not know, and

should not reasonably have known, that the act would further the organization's terrorist activity.

*Id.*

Notwithstanding a determination of terrorist activity an alien may be eligible for withholding of deportation or asylum. INA § 243, 8 U.S.C. § 1253, reads:

(h) Withholding of deportation or return.

(1) The Attorney General shall not deport or return any alien (other than an alien described in section 241(a)(4)(D)) to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.

(2) Paragraph (1) shall not apply to any alien if the Attorney General determines that—

(A) the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion;

(B) the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States;

(C) there are serious reasons for considering that an alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States; or

(D) there are reasonable grounds for regarding the alien as a danger to the security of the United States.

... For purposes of subparagraph (D), an alien who is described in § 241(a)(4)(B) [governing terrorist activity] shall be considered to be an alien for whom there are reasonable grounds for

regarding as a danger to the security of the United States.

(3) Notwithstanding any other provision of law, paragraph (1) shall apply to any alien if the Attorney General determines, in the discretion of the Attorney General, that—

(A) such alien's life or freedom would be threatened, in the country to which such alien would be deported or returned, on account of race, religion, nationality, membership in a particular social group, or political opinion; and

(B) the application of paragraph (1) to such alien is necessary to ensure compliance with the 1967 United Nations Protocol Relating to the Status of Refugees.

The instruction issued by the INS implementing AEDPA states that § 241(h)(3) is intended:

to permit the Attorney General to provide withholding of deportation to aliens who have engaged in "terrorist activities" but do not pose a danger to the security of the United States. Thus, it should be applied in the same way as the exception to the terrorist grounds for denying asylum.

INS Deputy Commissioner's Memorandum, "AEDPA Implementing Instruction # 3: The Effects of AEDPA on Various Forms of Immigration Relief," *reprinted in Interpreter Releases* 1439 (October 11, 1996). The discretionary waiver at § 241(h)(3) recognizes that an alien who has engaged in terrorist activity may not pose a danger to the security of the United States. The AEDPA Implementing Instruction requires a procedure for waiver similar to that under the asylum provisions now to be analyzed.

2. *Asylum.* As the asylum applications were filed before April 1, 1997, they are not governed by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. They are governed by INA § 208, as amended by AEDPA § 421. This section, entitled "Denial of Asylum to Terrorists," states:

The Attorney General may not grant an alien asylum if the Attorney General determines that the alien is excludable under subclause (I), (II), or (III) of section 212(a)(3)(B)(i) or deportable under section 241(a)(4)(B), unless the Attorney General determines, in the discretion of the Attorney General, that there are not reasonable grounds for regarding the alien as a danger to the security of the United States.

In its decision, the Board acknowledged that an alien excludable for participation in terrorist activity is not automatically a danger to the United States, and that the bar to relief requires a separate determination with respect to the alien's danger to national security. We agree with the Board's conclusion that automatically finding an alien to be such a danger "would render the exception to the asylum bar meaningless." The statutory scheme contemplates an alien who is potentially excludable under one of the designated provisions, yet remains eligible for withholding of deportation or asylum upon a determination that "there are not reasonable grounds for regarding the alien to be a danger to the security of the United States." *Cf. Nevada v. Watkins,* 939 F.2d 710, 715 (9th Cir.1991) ("[W]e should avoid an interpretation of a statute that renders any part of it superfluous and does not give effect to all of the words used by Congress.")

The statute imposes a two-part analysis: (1) whether an alien engaged in a terrorist activity, and (2) whether there are not reasonable grounds to believe that the alien is a danger to the security of the United States. Having determined that Cheema and his wife engaged in terrorist

activity, the Board turned to the second question of whether there are reasonable grounds for regarding them to be "a danger to the security of the United States."

■ In construing the phrase "danger to the security of the United States," the Board looked to several different definitions of the phrase "national security" but chose not "to adopt any of these definitions wholesale." Instead, the Board created its own test: an alien poses a danger to the security of the United States where the alien acts "in a way which 1) endangers the lives, property, or welfare of United States citizens; 2) compromises the national defense of the United States; or 3) materially damages the foreign relations or economic interests of the United States." We accept for the purposes of this appeal the Board's interpretation of the sense of "national security."

3. *CAT.* CAT creates a mandatory denial of withholding of deportation if the applicant falls within Section 241(b)(3)(B) of the INA. 8 C.F.R. § 208.16(d)(2). Section 241(b)(3)(B) creates an exception to the grant of withholding if "the Attorney General decides that ... there are reasonable grounds to believe that the alien is a danger to the security of the United States." 8 U.S.C. § 1231(b)(3)(B)(iv). This clause is further modified by the following clause stating: "For purposes of clause (iv), an alien who is described in section 237(a)(4)(B) [governing terrorist activities] shall be considered to be an alien with respect to whom there are reasonable grounds for regarding as a danger to the security of the United States." 8 U.S.C. § 1231(b)(3)(B).

## B. SUBSTANTIAL EVIDENCE

1. *Withholding of deportation.* Under the INA, aliens are rendered ineligible for withholding of deportation if "there are reasonable grounds for regarding them as a danger to the security of the United States." INA § 243(h)(2)(D). Aliens who have engaged in terrorist activity are considered a danger to the security of the United States subject to a discretionary waiver. We review whether substantial evidence supports both the finding of terrorist activity and the determination that the alien is a danger to the security of the United States. We may reverse the Board's findings of fact if we are "compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

■ Rajwinder Kaur's actions do not constitute terrorist activity under § 212(a)(3)(B)(iii), much less does substantial evidence demonstrate that she is a danger to the security of the United States. The only evidence regarding her donations or activities is her statement that she had "sent money on one or two occasions to ... women ... that were widowed or to children that were orphaned." No evidence supplies a link between the donations and any specific organization, let alone Sikh militant organizations. Given that the Board accepted Rajwinder Kaur's testimony as credible, the Board's conclusion that her donations to Indian widows and orphaned children "obviously" and "inherently" posed a danger to the security of the United States stretches speculation to its breaking point. If Rajwinder Kaur's one or two donations to unspecified widows and orphaned children are, without more, a reasonable basis to conclude that she posed a danger to the security of the United States, no alien could ever come within the "danger to the United States" exception.

The Board adopted the immigration judge's findings of fact. The immigration judge made no finding that these widows or orphans were engaged in terrorism, had committed or were planning to commit

terrorist acts, or were conduits to terrorist organizations. The Board is bound by this absence of factual foundation as it is bound by the IJ's and its own acceptance of the credibility of Rajwinder Kaur. Not a scrap of evidence shows her to have engaged in terrorist activity as defined in INA § 212(a)(3)(B)(iii).

■ The Board chose to construe some of Cheema's acts as terrorist activity as defined by the INA. Money that he raised did appear to reach Sikh resistance organizations in India. Unfavorable inferences were drawn from his telephone conversations with Sikh militants known to engage in terrorist activities. We are unable to say that we are compelled to reach contrary conclusions. The question remains whether substantial evidence supports the Board's conclusion that there are "reasonable grounds" for regarding Cheema as a danger to our national security.

■ The Board chose the first criterion of national security, that is, whether Cheema "endangers the lives, property, or welfare of United States citizens." The Board did not address the alternative criteria relating to national defense or foreign relations and economic interests. Our review is limited to the Board's stated grounds for the national security finding. See SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). Our task is to consider whether this conclusion is supported by the requisite substantial evidence.

The Board stated only its conclusion: "It is clear that those who engage in terrorism within the United States, even when that terrorism is not directly aimed at the United States, necessarily endanger the lives, property, and welfare of United States citizens and compromises our national defense." According to the Board, it is "self-evident" that such activities "inherently involve this country in [foreign] conflicts without our leave or agreement" and "create the very real possibility that such conflicts will be brought home to use by their warring factions."

Saying that the conclusion is self-evident begs the question that the statute requires to be answered. Under the Board's rationale, the requirement of evidence that an alien presents a danger to our national security evaporates. The Board has collapsed the two prongs of the inquiry, focusing entirely on the question of terrorist activity. This Board's approach is an end-run around the very result the Board accepts as the appropriate interpretation of AEDPA § 421(a): namely, that an alien who is excludable under one of the designated provisions is not "necessarily" ineligible for asylum without first determining that there are reasonable grounds for regarding the alien to be a danger to national security. This approach also makes superfluous the other two prongs of the Board's own national security definition.

Substantial evidence is required to link the finding of terrorist activity affecting India with one of the criteria relating to our national security. With the extensive resources of the Executive Branch, including the resources of the Departments of Defense, State, Justice, Treasury and others, the INS is in a unique position to provide such evidence. It has not done so.

The Board cannot bypass the second prong of the statutory inquiry by asserting that its conclusions are "self-evident." See Ghaly v. INS, 58 F.3d 1425, 1430 (9th Cir.1995); cf. Paramasamy v. Ashcroft, 295 F.3d 1047 (9th Cir.2002) (Board's failure to provide requisite individual assessment warrants reversal). In so doing, the Board failed to adhere to its own interpretation of the statute. The omission in its analysis results in the danger that an alien who poses no threat to the security of the

858

United States could be denied proper relief. Without the benefit of the actual inquiry that the Board itself deems necessary, we cannot evaluate the substantial evidence requirement imposed on us on appellate review.

A part of a statutory scheme is to be interpreted in the context provided by the statute as a whole. INA § 243 sets out very specific and very serious reasons for denying withholding of deportation. The alien must himself have persecuted a person on the forbidden grounds of race, religion, etc. Or the alien must have been convicted by a final judgment of "a particularly serious crime" to constitute "a danger to the community of the United States." Or there are serious reasons for considering that the alien has committed "a serious nonpolitical crime" before his arrival in the United States. INA § 243(h)(2)(A), (B) and (C). Construing (D) in the context of these other exceptions, it cannot be the case that Congress wanted to create a bar to relief based on guesswork.

Contrary to the government's assertion, it is by no means self-evident that a person engaged in extra-territorial or resistance activities—even militant activities—is necessarily a threat to the security of the United States. One country's terrorist can often be another country's freedom-fighter. The Contras in Nicaragua, for instance, used terrorist tactics in an attempt to overthrow the ruling Sandinista government. It would be difficult to conclude, however, without specific evidence, that supporters of the Contras within the United States compromised national defense. The United States itself opposed the Sandinista regime and sent money to assist the Contras. Similarly, the Solidarity Movement that was instrumental in ending Communism in Eastern Europe was labeled by the Soviet Union as subversive and dangerous, but it can hardly be said that contributors to the Solidarity Movement posed a threat to the lives and property in the United States. We cannot conclude automatically that those individuals who are activists for an independent Tibet are necessarily threats to the United States because they have been labeled by China as insurgents. Without further evidence, it does not follow that an organization that might be a danger to one nation is necessarily a danger to the security of the United States.

History, indeed, is to the contrary. At least since 1848, the year of democratic revolutions in Europe, the United States has been a hotbed of sympathy for revolution in other lands, often with emigres to this country organizing moral and material support for their countrymen oppressed by European empires such as those of Austria, Britain and Russia. In the twentieth century, active revolutionaries such as De Valera and Ben Gurion worked in the United States for the liberation of their homelands. More recently, foreign anti-Communists living in the United States were active in encouraging and aiding movements against Communist tyranny in the Soviet Union and China. Much of this revolutionary activity would fall under the definition of terrorist activity as the Board interprets the statute. None of it had consequences for the lives and property of American citizens or the national defense, and the slight strains occasionally put on our foreign relations were more than offset by the reputation earned by the United States as a continuing cradle for liberty in other parts of the world.

That terrorist activity affecting a country struggling with strife cannot be equated automatically with an impact on the security of the United States is dramatically illustrated by the case of Nelson Mandela. In 1961, Mandela organized a

paramilitary branch of the African National Congress, Umkhonto we Sizwe (MK) or "Spear of the Nation," to conduct guerrilla warfare against the ruling white government. Anthony Sampson, Mandela: The Authorized Biography, Knopf (1999) at 150. He then went into hiding to carry out the MK's mission: "to make government impossible," and began arranging for key leaders and their volunteers to go abroad for training in guerrilla warfare. Sampson at 151, 158. Mandela was convicted by the South African government of treason in 1964 and sentenced to life in prison. In 1986, Congress passed the Comprehensive Anti–Apartheid Act, stating that its goal was to pressure the South African government to release Nelson Mandela from prison. 22 U.S.C. 5011 § 101(b)(2) (1986); Sampson at 177. It would not be sensible to conclude that Congress, in aiding a man convicted of treason by his own government, endangered the security of the United States or that the alien supporters of Mandela in this country were all deportable as terrorists endangering our national security.

To be clear, aliens who engage in terrorist activity *may* indeed affect this nation's security, but we cannot conclude that they always do so. Evaluation of this issue requires evidence, not speculation. If the INS, with the impressive resources of the federal government at its disposal, had provided reasons, backed by evidence, for finding Cheema and Rajwinder Kaur to be a threat to the national security of the United States, we would have a different case. But the Board simply does not provide those reasons.

Because the Board erred in determining whether Cheema was a "danger to the security of the United States," we remand to the Board to make that determination using the correct inquiry. *INS v. Ventu-ra*, 537 U.S. 12, 17, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002).

■ 2. *Asylum.* Because we are compelled to conclude that there is no evidence that Kaur engaged in terrorist activity, the Board erred in determining that Kaur is barred from the relief of asylum. The determination as to Cheema is to be made by the Board in the exercise of the discretion the statute has conferred upon the Attorney General. The determination is a negative one: there are not reasonable grounds for finding Cheema to be a danger to our national security. The discretion to be exercised is, of course, not that of a despot. The Board may not use its discretion to issue a decision that is "arbitrary, irrational, or contrary to law." *Lopez–Galarza v. INS*, 99 F.3d 954, 960 (9th Cir.1996). The Board must provide an objective basis for its holding. *Rodriguez–Matamoros v. INS*, 86 F.3d 158, 161 (9th Cir.1996). We will not deny the Board the opportunity to make this judgment.

■ 3. *CAT.* We defer to the Board's holding that Cheema's acts within the United States could be qualified as terrorist activity and affirm the Board's determination that full relief under CAT is barred for him. We affirm the Board's holding that Cheema may not be deported to the country where he is likely to be tortured. We recognize that this respite from torture is limited if the consequence is that a petitioner is deliberately detained in custody in this country. To be offered indefinite imprisonment as an alternative to likely torture is to be offered a harsh choice.

We disagree with the Board's denial of Rajwinder Kaur's CAT claim because there is no evidence that she engaged in terrorist activities while in the United States.

For the reasons stated, Cheema's petitions for withholding of deportation and

asylum are REMANDED; the deferral of removal and denial of full relief for him under CAT is AFFIRMED. Rajwinder Kaur's petitions for withholding and for full relief under CAT are GRANTED, and her petition for asylum is REMANDED for the exercise of discretion.

RAWLINSON, Circuit Judge, dissenting:

I must respectfully dissent.

Our review of asylum rulings made by the BIA has been curtailed in recent years. We may now reverse BIA's factual findings made in the context of ruling on an asylum application only if a contrary finding is *compelled* by the evidence. *See Gonzalez–Hernandez v. Ashcroft*, 336 F.3d 995, 998(9th Cir.2003). We must also defer to the BIA's interpretation of immigration law. *See Vasquez–Lopez v. Ashcroft*, 315 F.3d 1201, 1203 (9th Cir.2003).

Here is what the evidence in this case showed:

- The State Department has identified the Khalistan Commando Force (KCF), headed by Paramjit Singh Panjwar, and the Sikh Student Federation Faction (SSF) headed by Daljit Singh Bittu, as "terrorist Sikh organizations."
- These organizations have engaged in robbery, murder, bombings, kidnappings, threats and general mayhem.
- Bittu has variously been sought for the assassination of relatives of India's Vice–President, the assassination of an Indian Army General, and the largest bank robbery in India's history.
- Bittu distributed weapons to various terrorist organizations, after receiving money from a source in the United States.
- The KCF has taken responsibility for a massacre of bus passengers, who were machine-gunned after the bus was forced from the road, and for a series of car bombings that left 300 dead and 1,200 injured.
- Panjwar and Bittu are described by the Petitioner, Cheema, as close personal friends on whose behalf he has raised thousands of dollars in the United States.
- Cheema has acted as a communications link to Bittu and Panjwar by routing telephone calls through his home in the United States, and thereby avoid detection by Indian authorities.
- Cheema served as a communications link during the kidnapping of the Romanian ambassador by Sikh terrorists.
- Cheema provided food and shelter to terrorists while they were fugitives from the police.
- Cheema's wife functioned in his stead during his absence.

It is not difficult to connect the dots from Cheema and his wife to Panjwar to Bittu and back again. The BIA's finding that Cheema materially supported terrorist activity is bolstered by substantial evidence, including Cheema's own testimony.

A finding that Cheema provided material support to major international terrorists in turn substantiates the BIA's finding that Cheema and his wife threaten the security of this country. Car bombings, assassinations of government officials, massacres-world wars have begun with less impetus. *See Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 494 F.Supp. 1190, 1219 (E.D.Pa.1980) ("On June 28, 1914, the assassination in Sarajevo of Archduke Franz Ferdinand of Austria–Hungary set off a chain of events that within a few months embroiled all Europe in World War I."); *see also* M. Cherif Bassiouni, *World War I: "The War to End*

*All Wars" and the Birth of a Handicapped International Criminal Justice System,* 30 Denv. J. Int'l L. & Pol'y 244, 244 (2002) ("The trigger for [World War I] was an incident that occurred in the volatile Balkans on June 28, 1914, in which Archduke Franz Ferdinand and his wife were assassinated by Gavrilo Princip as they rode in a car in Sarajevo").

Contrary to the majority's apparent view, our country should not become a haven for those who desire to foment international strife from our shores. I would deny the petition.