# In re A-H-, Respondent

*Decided by Attorney General January 26, 2005*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1) The Attorney General denied asylum in the exercise of discretion to a leader-in-exile of the Islamic Salvation Front of Algeria who was associated with armed groups that committed widespread acts of persecution and terrorism in Algeria, because the United States has significant interests in combating violent acts of persecution and terrorism, and it is inconsistent with these interests to provide safe haven to individuals who have connections to such acts of violence.

(2) Terrorist acts committed by the armed Islamist groups in Algeria, including the bombing of civilian targets and the widespread murders of journalists and intellectuals on account of their political opinions or religious beliefs, constitute the persecution of others.

(3) A person who is a leader-in-exile of a political movement may be found to have "incited, assisted, or otherwise participated in" acts of persecution in the home country by an armed group connected to that political movement where there is evidence indicating that the leader (1) was instrumental in creating and sustaining the ties between the political movement and the armed group and was aware of the atrocities committed by the armed group; (2) used his profile and position of influence to make public statements that encouraged those atrocities; or (3) made statements that appear to have condoned the persecution without publicly and specifically disassociating himself and his movement from the acts of persecution, particularly if his statements appear to have resulted in an increase in the persecution.

(4) The phrase "danger to the security of the United States" means any nontrivial risk to the Nation's defense, foreign relations, or economic interests, and there are "reasonable grounds for regarding" an alien as a danger to the national security where there is information that would permit a reasonable person to believe that the alien may pose such a danger.

(5) The Attorney General remanded the record for further consideration by the Board of Immigration Appeals of the questions whether (1) there is sufficient evidence to indicate that the respondent "incited, assisted, or otherwise participated in the persecution" of others; (2) deference should be given to the credibility findings of the Immigration Judge; (3) there are "reasonable grounds for regarding [the respondent] as a danger to the security of the United States"; (4) the respondent presently faces a threat to his life or freedom if removed to Algeria; and (5) the respondent presently faces a likelihood of being tortured in Algeria.

FOR APPLICANT: Malea Kiblan, Esquire, McLean, Virginia

FOR DEPARTMENT OF HOMELAND SECURITY: Andrew Arthur, Associate General Counsel

## BEFORE THE ATTORNEY GENERAL
### (January 26, 2005)

This matter was referred to the Attorney General by the Acting Commissioner of the Immigration and Naturalization Service from the decision of the Board of Immigration Appeals ("BIA") granting respondent asylum. *Matter of A-H-* (BIA 2000). The BIA's decision is vacated in its entirety, respondent is found excludable and ordered excluded, respondent's application for asylum is denied, and respondent's applications for withholding of deportation and deferral of removal to Algeria are remanded for further proceedings consistent with this opinion.

## OPINION

This matter was referred to the Attorney General by the Acting Commissioner of the Immigration and Naturalization Service ("INS" or "Service") from the decision of the Board of Immigration Appeals ("BIA" or "Board") granting respondent asylum. *Matter of A-H-* (BIA 2000). For the reasons set forth below, I vacate the BIA's decision in its entirety, find respondent excludable and order him excluded, deny respondent's application for asylum, and remand respondent's applications for withholding of deportation and deferral of removal to Algeria for further proceedings consistent with this opinion.

## I.  BACKGROUND

Respondent, an Algerian national, has been active in the Algerian Islamist movement for decades and is a self-proclaimed leader-in-exile of the Islamic Salvation Front of Algeria, known by its French acronym "FIS." The FIS appeared to be on the verge of winning parliamentary elections in Algeria in 1992 when the elections were canceled by the Algerian Government. For some years thereafter, Algeria was wracked by internal conflict between security forces and armed Islamist groups bent on overthrowing the Government. As the State Department reported in 1997:

> Most sources estimate that [in the mid-1990s] an average of 10,000 people were killed every year . . . . Both sides committed abuses. There is convincing evidence that the security forces carried out dozens of extrajudicial killings and often tortured and otherwise abused detainees . . . .
>
> Armed Islamic groups also committed abuses and atrocities. Terrorists carried out widespread attacks on innocent civilians. They assassinated political figures,

journalists, academics and thousands of other civilians as well as a number of foreigners. . . . Terrorists using bombs and car bombs attacked electric pylons, telephone exchanges, schools, bridges, police and military headquarters, local government offices, and railroad trains and tracks. Car bombs caused hundreds of civilian deaths.

Two of the most active and violent armed Islamist groups in Algeria were the Armed Islamic Group, or "GIA," and the Islamic Salvation Army, or "AIS." The AIS has been identified as the armed wing of the FIS. In May 1994, the GIA, the AIS, and other armed Islamist groups joined under one banner and became known collectively as the GIA. The record indicates that these armed groups engaged in terrorism and widespread persecution of civilians in Algeria. The Secretary of State has designated the GIA as a "foreign terrorist organization" for its activities during the mid-1990s. The State Department determined that these groups targeted journalists for assassination "because they are viewed as supportive of the Algerian government and antagonistic toward the goals of these militants" and murdered intellectuals who were deemed "unsympathetic to the Islamic cause as defined by Islamic militants." The AIS issued a statement in August 1994 labeling journalists "Enemies of the Nation" and vowing that they would "receive the implementation of God's law." An Amnesty International report introduced into evidence by respondent states that between mid-1993 and November 1996 more than 60 journalists in Algeria died in killings "believed to have been carried out by armed opposition groups." Human Rights Watch reported, "Between March and November 1993, some twenty members of the intelligentsia were murdered, . . . includ[ing] seven journalists, . . . [a] professor of law, . . . [and] a physician and human rights activist." A September 1994 report from Jane's Intelligence Review states that the GIA was responsible for numerous murders of intellectuals from the beginning of the conflict, including the August 1994 murder of the director of the Agronomy Institute at Blida University. The GIA targeted civilians not only on the basis of their political opinions but also on account of their religion. As the State Department report related, "In 1994, the GIA declared its intention to eliminate 'Jews, Christians, and Polytheists' from Algeria."

Respondent fled from Algeria in 1992 and first applied for asylum in the United States in 1993. The INS denied respondent's application in 1996 based on evidence that he was complicit in acts of terrorism and persecution in Algeria, and thereafter detained respondent and initiated exclusion proceedings against him on the ground that he lacked a valid entry document pursuant to section 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(7)(A)(i)(I) (1994).[1] In 1997, an Immigration Judge found

---

[1] On March 1, 2003, after the events in question here, the INS ceased to exist as an agency within the Department of Justice, and its functions of processing applications for asylum and

(continued...)

respondent excludable under section 212(a)(7)(A)(i)(I), denied respondent's request for asylum and withholding of deportation, and ordered him excluded and removed from the United States. *Matter of A-H-* (I.J. 1997). The BIA reversed and remanded for a new hearing after concluding that the record was insufficient to support deportation. *Matter of A-H-* (BIA 1998). On remand, a second Immigration Judge heard additional evidence and again concluded that respondent was excludable, denied his request for asylum and withholding of deportation, and ordered him excluded and removed, but deferred his removal to Algeria pursuant to the law and regulations implementing the Convention Against Torture. *Matter of A-H-* (I.J. 1999).[2]

Respondent appealed, and the BIA once again reversed, this time ordering that respondent be granted asylum in the United States. *Matter of A-H-* (BIA 2000). In its decision, the BIA made several determinations: First, the BIA determined that the INS failed to offer sufficient evidence to indicate respondent had "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion" for purposes of establishing respondent's ineligibility for asylum pursuant to 8 C.F.R. § 208.13(c) (2000) and for withholding of deportation under former section 243(h)(2)(A) of the Act, 8 U.S.C. § 1253(h)(2)(A) (1994). *See also* section 101(a)(42) of the Act, 8 U.S.C. § 1101(a)(42) (1994) ("The term 'refugee' does not include any person who ordered, incited, assisted, or otherwise participated in the persecution of any person . . . ."); section 208(b)(2)(A)(i) of the Act, 8 U.S.C. § 1158(b)(2)(A)(i) (2000) (setting forth the same bar to eligibility for asylum applications filed on or after April 1, 1997); 8 C.F.R. § 1208.13(c)(2)(E) (2005) (prescribing a bar to eligibility for asylum applications filed before April 1, 1997).[3] Second, the BIA rejected the

---

[1] (...continued)
enforcing the immigration laws were transferred to components of the Department of Homeland Security, pursuant to the Homeland Security Act of 2002, Pub. L. No. 107-296, §§ 441, 447, 116 Stat. 2135, 2192, 2205.

[2] *See* Omnibus Consolidation and Emergency Supplemental Appropriations Act of 1999, Pub. L. No. 105-277, § 2242, 112 Stat. 2681, 2681-822; *Regulations Concerning the Convention Against Torture*, 64 Fed. Reg. 8478 (INS Feb. 19, 1999) (codified at 8 C.F.R. §§ 1208.16-1208.18 (2005)); United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85 (entered into force June 26, 1987).

[3] Because respondent's application for asylum was filed before April 1, 1997, his case is subject to the law in effect prior to the amendments made by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No.104-208, 110 Stat. 3009-546 ("IIRIRA"). *See* IIRIRA §§ 309, 604(c), 110 Stat. at 3009-625, 3009-692. Accordingly, except where indicated otherwise, I have cited the 1994 edition of the United States Code throughout this opinion. The substantive provisions governing respondent's

(continued...)

Immigration Judge's findings on the credibility of respondent's testimony in response to the INS's evidence.  Third, the BIA determined that there were insufficient grounds to regard respondent as a danger to the security of the United States under section 208(b)(2)(A)(iv) of the Act (asylum) and former section 243(h)(2)(D) of the Act (withholding of deportation).  *See also* 8 C.F.R. § 1208.13(c)(2)(C) (exception to asylum for cases filed before April 1, 1997).  Fourth, the BIA concluded that it was inappropriate to deny respondent asylum as an exercise of the Attorney General's discretion under section 208(b)(1) of the Act and 8 C.F.R. § 208.14(a) (2000).  Fifth, the BIA reversed the Immigration Judge's finding that respondent was inadmissible under section 212(a)(3)(B) of the Act based on a reasonable ground to believe respondent had engaged in or was likely to engage in terrorist activity. Finally, the BIA agreed with the Immigration Judge that respondent was eligible for deferral of removal to Algeria under the Convention Against Torture.

The Acting Commissioner of the INS referred the BIA's decision to the Attorney General, and on January 19, 2001, the Attorney General certified the appeal and stayed the Board's decision.  *Matter of A-H-, AG Order No. 2380-2001* (2001) (attachment to *Matter of E-L-H-*, 23 I&N Dec. 700 (A.G. 2004; BIA 1998)).  Both the INS and respondent have submitted briefs addressing the issues raised by referral of the BIA's decision.

## II.  DISCUSSION

There is no dispute in this case that respondent is excludable under section 212(a)(7)(A)(i)(I) of the Act for failure to possess a valid entry document; he conceded inadmissibility on that ground below and does not contest it here. Accordingly, I find respondent excludable and order him excluded.  The principal questions before me, then, are whether respondent is eligible for asylum or withholding of deportation and, if not, whether he is entitled to deferral of removal to Algeria under the Convention Against

---

[3] (...continued)

applications for asylum and withholding of deportation, however, are substantially identical to the parallel provisions in effect today. *Compare* section 101(a)(42) of the Act (definition of "refugee"), former section 243(h) of the Act (withholding of deportation and exceptions thereto), *and* 8 C.F.R. § 1208.13(c)(2) (exceptions to asylum applicable to applications filed before April 1, 1997) *with* section 101(a)(42) of the Act, 8 U.S.C. § 1101(a)(42) (2000) (definition of "refugee"), section 208(b)(2)(A) of the Act (exceptions to asylum applicable to applications filed on or after April 1, 1997), *and* section 241(b)(3) of the Act, 8 U.S.C. § 1231(b)(3) (2000) (withholding of removal and exceptions thereto).  Accordingly, the legal principles enunciated herein are equally applicable to asylum and withholding of removal cases arising under current law.

Torture. On these issues, I find several errors in the BIA's decision and vacate that decision in its entirety.[4]

As set forth below, I conclude on the issue of asylum that it is appropriate to deny asylum to respondent as an exercise of my discretion under section 208(a) of the Act, 8 U.S.C. § 1158(a) (1994), primarily because of respondent's association with armed groups that have committed widespread acts of persecution and terrorism in Algeria. Turning to the issue of withholding of deportation under former section 243(h)(2)(A) of the Act, I conclude that the BIA made four legal errors that require vacatur and remand. First, I conclude that the BIA applied the wrong legal standard in holding that the INS offered insufficient evidence to indicate that respondent "incited, assisted, or otherwise participated in the persecution" of others for purposes of the statutory bar on eligibility for withholding of deportation in former section 243(h)(2)(A). I set forth the correct legal standard governing this inquiry and remand to the BIA to apply the correct standard to the record evidence as a whole. Second, I conclude that the BIA failed to give adequate deference to the Immigration Judge's findings on the credibility of respondent's testimony in response to the INS's evidence. Third, I conclude that the BIA applied the wrong legal standard for determining whether there are "reasonable grounds for regarding [respondent] as a danger to the security of the United States" for purposes of ineligibility for withholding of deportation under former section 243(h)(2)(D). I set forth the correct legal standard governing this inquiry and remand this issue as well to the BIA to apply the correct standard in light of all record evidence. And fourth, I reopen and remand for further consideration (including further submissions, as appropriate, from the State Department and the parties) the question whether respondent presently faces a threat to his life or freedom if removed to Algeria for purposes of establishing eligibility for withholding of deportation under former section 243(h)(1). Finally, with respect to the applicability of the Convention Against Torture and its implementing law and regulations, I

_____

[4] The Attorney General has authority to conduct de novo review of BIA decisions. *See Deportation Proceedings for Joseph Patrick Thomas Doherty,* 13 Op. O.L.C. 1, 7 (1989); *Deportation Proceedings for Joseph Patrick Thomas Doherty,* 12 Op. O.L.C. 1, 3-4 (1988). Respondent argues at length that my review of the BIA decision should be deferential, not de novo, but he fundamentally misconceives the role of the Attorney General in reviewing decisions of the BIA. "The BIA is entirely a creation of the Attorney General," 12 Op. O.L.C. at 3 n.5 (citing *Greene v. INS,* 313 F.2d 148 (9th Cir. 1963)), and exercises only such authority as is delegated to it by the Attorney General. *See* 8 C.F.R. § 1003.1(d)(l) (2005). The Attorney General has retained full decision-making authority under the immigration statutes, including "full authority to receive additional evidence and to make de novo factual determinations." 12 Op. O.L.C. at 4; *see also INS v. Doherty*, 502 U.S. 314, 327 (1992) (same).

reopen and remand for further consideration the threshold question whether respondent presently faces a likelihood of torture for purposes of deferral of removal to Algeria.[5]

## A. Discretionary Denial of Asylum

The Attorney General may deny asylum in his discretion even where the applicant is otherwise eligible for asylum. *See* section 208(a) of the Act, 8 U.S.C. § 1158(a) (1994) (stating that "the alien *may* be granted asylum *in the discretion of the Attorney General* if the Attorney General determines that such alien is a refugee") (emphasis added); *see also* section 208(b)(1) of the Act, 8 U.S.C. § 1158(b)(1) (2000) ("The Attorney General *may* grant asylum to an alien who has applied for asylum in accordance with the requirements and procedures established by the Attorney General . . . .") (emphasis added); 8 C.F.R. § 1208.14(a) (2005). Contrary to the BIA's determination, I conclude that the record presented here makes it appropriate to deny respondent asylum in the exercise of my discretion, even if he would otherwise be eligible for asylum.

The INS introduced evidence below indicating that respondent, through his active leadership position in the FIS, had ties to the armed Islamist groups that committed acts of persecution and terrorism in Algeria in the mid-1990s. Respondent is an acknowledged leader and spokesman for the FIS, the principal Algerian Islamic opposition organization. There is evidence suggesting that the FIS was involved in the killing of civilians. *See, e.g.*, Testimony of Professor Yonah Alexander, Director of the Terrorism Studies Program, George Washington University, testifying that "FIS and allied organizations such as the [GIA] have been waging a campaign of terrorism since 1992 against the Algerian government and secular persons and institutions," that FIS "engages in political assassination, attacks security forces and has murdered foreigners," and that FIS's targets "include journalists, physicians and other professionals" and "Western targets." Similarly, Amnesty International reported that the FIS "has repeatedly claimed that it has influence over the armed Islamist groups in Algeria." In his own testimony below, respondent admitted that he supported the GIA and its use of force before November 1995. He also testified that he "supported the unification effort" of the armed groups, including the GIA, in May 1994, and

---

[5] The BIA also reversed the Immigration Judge's sua sponte ruling that respondent is separately inadmissible because there is "reasonable ground to believe [respondent] is engaged in, or is likely to engage after entry in any terrorist activity" under section 212(a)(3)(B) of the Act. In light of my conclusions on the other issues raised in this case and my review of the record, I conclude that it is unnecessary for me to reach this separate ground for inadmissibility. I vacate those portions of the decisions below addressing this question, and I remand this issue to the BIA for further consideration, if and as the BIA determines appropriate.

he took personal credit for achieving this unification: "with the help of my leadership [the armed groups] joined . . . within one movement," and this unified group "ha[s] used the name of this GIA." The September 1994 Jane's Intelligence Review reported that respondent had stated that AIS forces would be joining GIA fighters. He has acknowledged that his support for the GIA was "well documented," and he has stated, "I did strongly support the GIA. I supported it because we had a pact." Other statements attributed to respondent indicate that he viewed the GIA and the AIS as integrally related and part of one unified "mujahidin" armed alliance that sprang "from the womb of FIS." An excerpt from a French newspaper in the file quoted respondent as saying, "The GIA exists in the media. They must stop using this terminology and talk instead of the Mujahidin . . . . We are finally supporting the struggle of the Mujahidin." Another report indicated that "A-H- . . . has stated that the rumors about disagreement or conflict between the [AIS] and [GIA] are mere illusions for 'the mujahidin have the same war and the same peace, and they are all from the womb of FIS.'"[6]

According to a report compiled by an affiliate of the British magazine *The Economist*, respondent declared at a public conference held in Europe in mid-June 1993 that the FIS would pursue an armed "struggle" in Algeria "to eliminate the junta in power and those who influence it," statements suggesting to the authors of the report that the targets of the armed groups would include intellectuals and influential civilians who supported the Algerian Government and opposed the creation of an Islamic state. Around the time of respondent's statements, five intellectuals were killed in Algeria, including at least two who were not directly involved in politics. In particular, a psychiatry professor, Dr. Mahfoud Boucebci, was brutally murdered in Algiers on June 15, 1993. Although respondent claimed to be shocked by Dr. Boucebci's death, he testified in the proceedings below that he understood from other FIS members that Dr. Boucebci was assassinated because he was reputedly involved in the torture of FIS members. In an interview with Agence France-Presse 2 days after Dr. Boucebci's death, respondent declared that the murder was "a sentence and not a crime," and that while the indiscriminate killing of intellectuals is not justified, many of these "so-called intellectuals" are really informers for the Algerian Government.

In an October 1993 interview with Agence France-Presse, respondent was quoted in greater detail on the killing of Algerian intellectuals:

> Who are these so-called intellectuals? Among them are members of the National Consultative Council, which has usurped the place of the people's elected

---

[6] The GIA itself issued a document in August 1994 identifying respondent as the "Minister of Foreign Relations" for the GIA's "Revolutionary Council." Respondent denied that he held this position with the GIA, but this document indicates, at a minimum, that the GIA regarded respondent as one of its leaders and looked to him for guidance, support, and leadership.

representatives, persons who wrote murderous editorials . . . and those who, through psychiatry, advised torturers on how to obtain confessions . . . . The Algerian people have chosen as targets only those individuals upon whom the military-security system in Algeria relies. We know them one by one, and they are not innocent people.

In a May 1994 interview with the French periodical *Liberation*, respondent did not disavow violence against intellectuals, journalists, and civilians. Although he condemned the killing of what he called "innocent people," he said that "we need to agree on the meaning of the word 'innocent' [because] pseudo-intellectuals or pseudo-democrats for whom democracy ends where their failure begins" are not "innocent." He also said,

> I will not get into [the murder of Algerian journalists]. We suggested to our mujahidin brothers that they might hit on those who backed the coup. These are a group of extremist secularists who reject the choice of the Algerian people. It so happens that among them are a number of academics, journalists, politicians, soldiers, etc.

The evidence suggests that respondent's statements purporting to justify terrorist activities by the armed Islamist groups in Algeria may have corresponded with an increase in the targeted killing of civilians. Human Rights Watch reported that "[s]ixteen journalists were assassinated in the first ten months of 1994." The February 1995 IC Publications report estimated that 200 journalists had fled Algeria to France "after FIS threats began to translate into real acts."

Evidence also indicates that other leaders within the FIS believed respondent had "one foot in the GIA camp," and they associated him with the GIA's assassination of two FIS leaders in November 1995 because of his failure to condemn those assassinations. Finally, respondent testified below that after the GIA's murder of the FIS leaders, he "disassociated" himself from the GIA, which clearly implies that he was "associated" with the GIA up until at least November 1995.

I conclude that, taken together, the circumstances concerning respondent's links to the activities of the armed Islamist groups in Algeria, as outlined above, strongly weigh against a discretionary grant of asylum in this case, whether or not respondent has a well-founded fear of persecution if returned to Algeria. The United States has significant interests in combating violent acts of persecution and terrorism wherever they may occur, including in Algeria, and it is inconsistent with these interests to provide safe haven to individuals who have connections to such acts of violence. It is also in the national interest of the United States for Algeria to achieve a peaceful and stable resolution to the conflicts that have plagued that nation.

Moreover, certain additional factors weigh against asylum for respondent: Specifically, respondent testified that he received money from overseas for his

political work,[7] yet he never filed income tax returns in the United States and his children nevertheless received financial assistance from the Commonwealth of Virginia. Respondent's apparent tax violations and his abuse of a system designed to provide relief to the needy exhibit both a disrespect for the rule of law and a willingness to gain advantage at the expense of those who are more deserving. Although there are equities that weigh in respondent's favor—for example, his wife and children reside legally in the United States and three of his children are United States citizens—these equities do not outweigh the negative factors I have identified. My view, based on a thorough review of the record and considering the balance of factors discussed above, is that respondent is not entitled to become a lawful permanent resident of the United States. Therefore, I deny respondent's application for asylum in the exercise of my discretion.

## B. Withholding of Deportation

Although I have denied respondent's application for asylum, respondent may still be entitled to mandatory withholding of deportation to Algeria if (1) he faces a threat to his life or freedom in Algeria because of his race, religion, nationality, membership in a particular social group, or political opinion (a requirement that I discuss in part II.B.4 below), and (2) none of the exceptions to eligibility for withholding of deportation applies to respondent. *See* former section 243(h) of the Act; 8 C.F.R. § 1208.16 (2005). I address in the following discussion each of the issues concerning withholding of deportation raised by the BIA's opinion.

## 1. Persecution of Others

The BIA concluded that the INS offered insufficient evidence to indicate that respondent had "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion" for purposes of the exception to withholding of deportation set forth in former section 243(h)(2)(A) of the Act. I conclude the BIA applied an incorrect legal standard in making that determination. I vacate this determination and remand for further proceedings consistent with the legal standard articulated herein.

There can be no doubt that the terrorist activities of the armed Islamist groups in Algeria during the 1990s constituted "persecution . . . on account of . . . religion . . . or political opinion." It is well established that nongovernmental actors, such as terrorists, insurgents, guerrilla organizations, or other militant opposition groups, can be guilty of "persecution" within the

---

[7] With respect to the money he received from overseas, respondent used the term "FIS donations." When asked if it was a salary, respondent said, "If you can say that, yeah."

meaning of the Immigration and Nationality Act. *See, e.g.*, *Borja v. INS*, 175 F.3d 732, 735 n.1 (9th Cir. 1999) (en banc) (Philippine opposition group); *Sotelo-Aquije v. Slattery*, 17 F.3d 33, 37 (2d Cir. 1994) (Shining Path guerrilla organization in Peru). In the context of a civil war between a government and opposition groups, the BIA has determined that "persecution" does not include "harm which may result incidentally" from, or that is directly related to, the military objectives of the armed conflict, including "the drafting of youths as soldiers, the unofficial recruiting of soldiers by force, the disciplining of members of a rebel group, or the prosecution of draft dodgers." *Matter of Rodriguez-Majano*, 19 I&N Dec. 811, 815 (BIA 1988); *cf. INS v. Elias-Zacarias*, 502 U.S. 478 (1992) (holding that guerrilla organization's attempt to coerce person into military service did not necessarily constitute persecution). I need not decide here whether the BIA's interpretation of "persecution" in this regard is correct, because the terrorist acts committed by the armed Islamist groups in Algeria, including the bombing of civilian targets and the widespread murders of journalists and intellectuals on account of their political opinions or religious beliefs, clearly go well beyond anything that could fairly be characterized as "incidental" to an armed conflict with the Government. Moreover, I reject categorically any tacit acceptance of the persecutor's perspective in judging whether civilians targeted for murder are "innocent."

The primary issue, then, is whether respondent "ordered, incited, assisted, or otherwise participated in" the acts of persecution committed during the 1990s by the armed Islamist groups in Algeria. The specific terms applicable in this case are "incited, assisted, or otherwise participated in," since there is no allegation by the INS that respondent "ordered" specific acts of persecution. The plain meaning of the relevant words in the statute is broad enough to encompass aid and support provided by a political leader to those who carry out the goals of his group, including statements of incitement or encouragement and actions that result in advancing the violent activities of the group. To "incite" means "to move to a course of action: stir up: spur on: urge on" or "to bring into being: induce to exist or occur." *Webster's Third New International Dictionary of the English Language Unabridged* 1142 (2002). To "assist" means "to give support or aid: help." *Id*. at 132. And to "participate" means "to take part in something (as an enterprise or activity) usu. in common with others." *Id*. at 1646. Case law teaches that (1) these terms are to be given broad application, *see, e.g.*, *Kulle v. INS*, 825 F.2d 1188, 1193 (7th Cir. 1987); (2) they do not require direct personal involvement in the acts of persecution, *see, e.g.*, *Ofosu v. McElroy*, 98 F.3d 694, 701 (2d Cir. 1996); (3) it is highly relevant whether the alien served in a leadership role in the particular organization, *see, e.g.*, *Kalejs v. INS*, 10 F.3d 441, 444 (7th Cir. 1993); and (4) in certain circumstances statements of encouragement alone

can suffice, *see, e.g.*, *United States v. Koreh*, 59 F.3d 431, 440 (3d Cir. 1995).[8] It is appropriate to look at the totality of the relevant conduct in determining whether the bar to eligibility applies. *See, e.g.*, *Hernandez v. Reno,* 258 F.3d 806, 814 (8th Cir. 2001).

I conclude that a person, such as respondent, who is a leader-in-exile of a political movement may be found to have "incited," "assisted," or "participated in" acts of persecution in the home country by an armed group connected to that political movement. Examples of evidence that could support such a finding would include evidence indicating that the leader was instrumental in creating and sustaining the ties between the political movement and the armed group and was aware of the atrocities committed by the armed group, evidence that he used his profile and position of influence to make public statements that encouraged those atrocities, or evidence that he made statements that appear to have condoned the persecution without publicly and specifically disassociating himself and his movement from the acts of persecution, particularly if his statements appear to have resulted in an increase in the persecution. These examples are not intended to be exhaustive.

Here, the INS presented evidence that respondent, in his capacity as a recognized leader of the FIS, made widely published statements that could be read as encouraging or condoning violent actions taken by the GIA and the AIS. Certain evidence, including respondent's own testimony, also indicates that in 1994 respondent personally facilitated the unification of the AIS and GIA through the FIS, and these actions could have supported and strengthened the activities of the GIA. Moreover, respondent did not attempt publicly to disassociate himself and the FIS from the GIA until at least November 1995, even though there is evidence in the record, some of it offered by respondent himself, indicating that the GIA's terrorist acts were apparent well before that time.

I will leave it to the BIA on remand to apply these principles to the record in this case, taken as a whole. I also leave it to the BIA to determine whether it is appropriate to remand this case to an Immigration Judge for additional relevant fact-finding.

---

[8] The *Koreh* case construed a related provision in the Displaced Persons Act of 1948, Pub. L. No. 80-774, ch. 647, 62 Stat. 1009 (1948), *as amended by* Pub. L. No. 81-555, ch. 262, 64 Stat. 219 (1950) ("DPA"), which prohibited the issuance of entry visas to "any person who advocated or assisted in the persecution of any person because of race, religion, or national origin." 59 F.3d at 438 (quoting DPA § 13, 64 Stat. at 227). The Third Circuit concluded that the defendant's involvement as an editor in the publication of anti-Semitic articles in Hungary during World War II "*assisted in the persecution* of Hungarian Jews" by "fostering a climate of anti-Semitism" that "conditioned the Hungarian public to acquiesce [in], to encourage, and to carry out" acts of persecution. 59 F.3d at 440 (emphasis added). This holding was independent of a separate conclusion by the court that the defendant also "advocated" persecution within the meaning of the DPA. *See id*. at 439-43.

## 2. Credibility Findings

Assuming the INS did offer sufficient prima facie evidence to indicate that respondent "incited, assisted, or otherwise participated in" the persecution of persons in Algeria, the burden fell on respondent to disprove that he did so by a preponderance of the evidence. The principal evidence offered by respondent below was his own testimony denying such involvement. He claimed that the FIS had no connection with the violent actions of the armed Islamist groups, including the GIA, that the GIA did not engage in persecution before November 1995, and that, if it did, he was unaware of it. The Immigration Judge rejected these statements as not credible. She expressly found that "the credibility of [respondent's] denials of his involvement with various violent activities, and in a leadership role with armed opposition groups" was "completely, utterly lacking." The Immigration Judge explained that respondent "failed or refused to answer questions," gave "inconsistent and/or implausible answers to questions," "crafted [his responses] to seem benign and to appeal to Western sensibilities," and "often answered questions with incoherent statements." She further explained that "[w]hen asked about the relationship between the FIS and the Islamic Salvation Army, [respondent] answered evasively and failed to explain the relationship." Addressing respondent's credibility, the Immigration Judge noted that "[s]everal statements made by the applicant were inconsistent."

Indeed, respondent's assertions that the FIS had no links to the armed groups and that the GIA did not engage in persecution before November 1995 do appear to contradict significant evidence in the record. For example, respondent claimed that before November 1995, the GIA did not kill journalists, women who appeared without veils or scarves, family members of the security forces, or other civilians, but this claim was inconsistent with evidence that he himself offered detailing such acts committed before November 1995 by armed Islamic groups, the most prevalent of which was the GIA. Moreover, respondent's claim that he was unaware of such acts of persecution before November 1995 does strain credulity, in light of the evidence in the record revealing widespread public discussion of the violent conflict in Algeria. Certainly, the Immigration Judge who personally observed respondent's testimony is particularly well situated to judge the credibility of his assertion of lack of personal knowledge on these key points.

Nevertheless, the BIA rejected all of the Immigration Judge's adverse credibility findings. I conclude that the BIA failed to give the Immigration Judge's credibility findings the proper deference. Although the BIA did acknowledge that ordinarily the credibility findings of an Immigration Judge are owed deference, the BIA concluded that here the Immigration Judge's adverse credibility findings were based only on "discrepancies and omissions" in respondent's testimony that either were not actually present or were insufficient to undermine respondent's credibility. I find the BIA's treatment

of the Immigration Judge's credibility determinations wholly inadequate. Much of the Immigration Judge's assessment of respondent's credibility related to his demeanor and sincerity as a witness, not only to asserted discrepancies or omissions in his testimony, and such assessments of testimonial credibility are uniquely within the ken of the Immigration Judge. *Cf. Anderson v. City of Bessemer*, 470 U.S. 564, 574-75 (1985) (noting "the superiority of the trial judge's position to make determinations of credibility" and explaining that "only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said"); *Wainwright v. Witt*, 469 U.S. 412, 428 (1985) (finding that "determinations of demeanor and credibility . . . are peculiarly within a trial judge's province") (footnote omitted); *United States v. D'Anjou*, 16 F.3d 604, 614 (4th Cir. 1994) (stating that courts are "reluctant to overturn factual findings of the trial court, [and] this is doubly so where the question goes to the demeanor and credibility of witnesses at trial, since the [trial] court is so much better situated to evaluate these matters"). Moreover, the inconsistencies that principally undermined respondent's credibility in the view of the Immigration Judge were inconsistencies between respondent's testimony and the other evidence in the record on the issues of whether there were instrumental links between the FIS and the armed Islamist groups AIS and GIA, whether the armed groups committed acts of violence against civilians prior to November 1995, and, if so, whether respondent was aware of those acts. These inconsistencies were not addressed by the BIA, perhaps because the Board considered the INS's evidence on these points insufficient or irrelevant.

As with the other issues relating to respondent's eligibility for withholding of deportation, I will remand to the BIA for further consideration the issue of whether to defer to the Immigration Judge's credibility findings. I conclude that a remand is appropriate on this issue so that the BIA may have an opportunity to consider these credibility findings in the context of the legal principles enunciated herein with respect to the applicability of the statutory bars to eligibility for withholding of deportation, and also because of the possibility that there may be additional fact-finding on remand.

### 3. Danger to National Security

As an alternative basis for denying withholding of deportation, the INS charged that "there are reasonable grounds for regarding [respondent] as a danger to the security of the United States" within the meaning of former section 243(h)(2)(D) of the Act. The Immigration Judge so found, based on the concern that if the United States affords immigration protection to respondent, respondent's political opponents may direct their violence against the United States or its citizens. The BIA reversed this determination. I also disagree with the reasoning applied by the Immigration Judge, but because I

conclude that the BIA may have relied on an incorrect legal standard on this question and because both the Immigration Judge and the BIA failed to apply the law correctly to the record in this case, I vacate the BIA's discussion on this point and remand for further proceedings consistent with this opinion.

I will address, in reverse order, the two major components of the phrase "reasonable grounds for regarding the alien as a danger to the security of the United States" as used in former section 243(h)(2)(D) of the Act. Turning first to the meaning of the phrase "a danger to the security of the United States": The ordinary meaning of the word "danger" is "exposure or vulnerability to harm or risk." *American Heritage Dictionary* 472 (3d ed. 1992). In contrast to other parallel provisions in former section 243(h)(2)—which provide, for example, that a crime be "serious" or "particularly serious" to constitute ineligibility for withholding of deportation, *see* former sections 243(h)(2)(B) and (C)—the statute's reference to "danger" is not qualified. Any level of danger to national security is deemed unacceptable; it need not be a "serious," "significant," or "grave" danger. That understanding is supported by the Government's use, in other contexts, of gradations of danger to national security. For example, for purposes of determining information classification levels, Executive Order No. 12958 categorizes the relative "damage" to national security caused by disclosure of certain types of information. *See* Exec. Order No. 12958 § 1.3 (describing the levels of such harm in descending order of severity as "grave damage," "serious damage," and "damage"). As these terms have common parlance in assessing risks to national security, Congress's decision not to qualify the word "danger" in former section 243(h)(2)(D) makes clear that Congress intended that any nontrivial level of danger to national security is sufficient to trigger this statutory bar to withholding of deportation. The INA defines "national security" to mean "the national defense, foreign relations, or economic interests of the United States." Section 219(c)(2) of the Act, 8 U.S.C. § 1189(c)(2) (2000). Read as a whole, therefore, the phrase "danger to the security of the United States" is best understood to mean a risk to the Nation's defense, foreign relations, or economic interests. Where, under the circumstances, information about an alien supports a reasonable belief that the alien poses a danger—that is, any nontrivial degree of risk—to the national security, the statutory bar to eligibility is applicable.

I turn next to what constitutes "reasonable grounds for regarding." The statutory reference to "reasonable" grounds implies the use of a reasonable person standard. *See Adams v. Baker*, 909 F.2d 643, 649 (1st Cir. 1990) (stating that a "'reasonable belief' may be formed if the evidence . . . is sufficient to justify a reasonable person in the belief that the alien falls within the proscribed category"). That much is consistent with the BIA's reliance on "probable cause" cases in construing the closely related phrase "reasonable ground to believe" as used in section 212(a)(3)(B)(i)(II) of the Act, 8 U.S.C.

§ 1182(a)(3)(B)(i)(II) (2000) (providing that an alien is inadmissible where "a consular officer or the Attorney General knows, or has reasonable ground to believe," the alien "is engaged in, or is likely to engage after entry in any terrorist activity"). *See Black's Law Dictionary* 1219 (7th ed. 1999) (equating "probable cause" with "reasonable cause; sufficient cause; reasonable grounds"); Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 3.3, at 140 (2d ed. 1992) (stating that "for there to be probable cause, the facts must be such as would warrant a belief by a reasonable man"). The BIA, however, suggested that this standard might require "having more evidence for than against" the stated proposition, quoting *Black's Law Dictionary* 1201 (6th ed. 1990) to define "probable cause" as "[r]easonable cause; having more evidence for than against." "Having more evidence for than against" is a preponderance of the evidence standard. I conclude that as used in the national security-related provisions of the Immigration and Nationality Act, "reasonable grounds for regarding" is substantially less stringent than preponderance of the evidence. *See Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (noting that "probable cause" is a less demanding standard than "preponderance of the evidence"); *Illinois v. Gates*, 462 U.S. 213, 235 (1983) ("Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the [probable cause] decision."). The "reasonable grounds for regarding" standard is satisfied if there is information that would permit a reasonable person to believe that the alien may pose a danger to the national security. *See, e.g.*, *Illinois v. Gates*, 462 U.S. at 235.

The information relied on to support the "reasonable grounds" determination need not meet standards for admissibility of evidence in court proceedings. In the only court opinion directly interpreting the phrase "reasonable ground to believe," as used in a closely related provision of the Act, the First Circuit in *Adams v. Baker*, *supra*, defined these words in light of the concerns associated with national security and immigration. The issue in *Adams* was whether Gerry Adams, an Irish national and president of Sinn Fein, the political arm of the Irish Republican Army, was properly denied entry into the United States under section 212(a)(3)(B)(i)(II) of the Act. *See* 909 F.2d at 646-47. The court rejected Adams's argument that the information relied on by the Government—including books, newspaper articles, and other printed materials—"could not properly form the basis of a 'reasonable ground to believe' that Adams engaged in terrorist activities." *Id*. at 649. Although the materials relied on by the Government "would be inadmissible [in a federal court] trial both because they contain hearsay and because the information relating to Adams' involvement in terrorist activities may be less than fully complete or reliable," the court concluded that they were properly considered in the immigration context and were "sufficient to justify a reasonable person in the belief that [Adams] falls within the

proscribed category." *Id*. (citations omitted). It was enough that the information relied upon by the Government was not "intrinsically suspect." *Id*.

I will remand to the BIA the issue of whether, applying the proper legal standards described above, there are reasonable grounds for regarding respondent as a danger to the security of the United States. On remand, it will be appropriate for the BIA to consider the record taken as a whole (including any further fact-finding that may be conducted) to determine whether the evidence would support a reasonable belief that respondent poses a danger to our national security interests, including the foreign relations and economic interests of the United States. Like the BIA, I find the Immigration Judge's reasoning on this point faulty. Nevertheless, the United States has significant foreign relations and economic interests in a peaceful resolution to the violence in Algeria, and the long-term stabilization of that Government is of significant importance to United States interests. Our Nation's multilateral efforts to fight international terrorism depend on a consistent and determined opposition to terrorism and related persecution of civilians wherever it appears, whether in Algeria or elsewhere. Our international fight against terrorism does not permit us to be seen by our international partners in this effort as providing safe harbor for those who engage in, espouse, support, assist, encourage, or lead others to commit violent acts of persecution and terrorism.

## 4.  Threat to Life or Freedom

As a threshold requirement for eligibility for withholding of deportation to Algeria, respondent bears the burden of establishing that, if returned to Algeria, his life or freedom would be threatened because of his race, nationality, religion, membership in a particular social group, or political opinion. *See* former section 243(h)(1) of the Act. Here, respondent did not assert that he actually suffered past persecution in Algeria; his claim was based on an asserted future threat to his life or freedom. *See* 8 C.F.R. § 1208.16(b)(2). The INS did not contest that threshold requirement at the outset of these proceedings; rather, the INS stipulated in 1997 that respondent had a well-founded fear of persecution (and presumably faced a threat to his life or freedom) if returned to Algeria. That stipulation was based on a 1997 State Department report on conditions in Algeria at that time. For the reasons that follow, I will reopen this threshold issue of the threat to respondent's life or freedom and remand this issue for further consideration, including further submissions from the State Department and the parties, as appropriate.

The Attorney General has authority to remand a case for additional fact-finding as he deems necessary and appropriate. There are two bases for this authority. First, the Attorney General may exercise the same powers as are delegated to the BIA, and one such power includes remanding applications

for additional fact-finding. *See* 8 C.F.R. § l003.l(d)(3) (2005). Specifically, the regulations governing BIA process provide that "[i]f further factfinding is needed in a particular case, the Board may remand the proceeding to the immigration judge or, as appropriate, to the Service," with or without a motion from the parties. 8 C.F.R. § 1003.1(d)(3)(iv). This authority ensures that the BIA is not denied essential facts that bear on the appropriate resolution of a case. The authority is not limited to facts contested by the parties; otherwise, the INS would be dissuaded from stipulating to facts in the early stages of a proceeding for fear the material facts may change over time. Second, without regard to the authority delegated to the BIA, the Attorney General's plenary authority to resolve applications for withholding or deferral of removal empowers him to remand a case whenever he deems additional fact-finding necessary or appropriate. *See* section 103(g)(2) of the Act, 8 U.S.C.A. § 1103(g)(2) (West Supp. 2004) (stating that the Attorney General shall "review such administrative determinations in immigration proceedings, delegate such authority and *perform such other acts as the Attorney General determines to be necessary for carrying out this section*") (emphasis added). Indeed, as the ultimate fact-finder, the Attorney General must be able to establish and verify all facts as they currently exist.

The significant amount of time that has passed since the outset of this case counsels in favor of a fresh consideration of the present facts and circumstances relevant to respondent's threshold claim of eligibility for withholding of deportation to Algeria. *See Berishaj v. Ashcroft*, 378 F.3d 314, 328-33 (3d Cir. 2004). Moreover, there are specific reasons here to believe that respondent may no longer satisfy that threshold requirement today, whether or not he did in 1997. Specifically: (1) country conditions in Algeria may have changed significantly since the time respondent was granted deferral of removal to Algeria (notably, I understand that other FIS leaders have been released from prison and allowed to return to their homes); (2) the Government of Algeria has instituted a grant of amnesty for political opponents and such amnesty may be available to respondent; and (3) after respondent was granted deferral of removal, he reportedly stated publicly that he was willing to return to Algeria, and this apparent willingness may undermine his earlier claim that he fears torture or a threat to his life or freedom based on persecution if returned there. Because the INS did not submit evidence on the merits of respondent's claim to threshold eligibility for withholding of deportation, and in light of these new considerations, I will reopen this issue and remand it to the BIA for further proceedings consistent with this opinion, including a further remand to the Immigration Judge, if appropriate. These further proceedings may include, as appropriate, an opportunity for further submissions by the parties and the Department of State on whether respondent presently faces a threat of persecution in Algeria, taking into account the relevant current conditions in Algeria.

## C.  Convention Against Torture

Like his application for withholding of deportation, respondent's application for deferral of removal to Algeria under the Convention Against Torture and the related implementing law and regulations requires a threshold showing by respondent—i.e., a showing that he would more likely than not be tortured if removed to Algeria.  *See* 8 C.F.R. §§ 1208.16(c)(2), 1208.17 (2005).  The Immigration Judge found, in 1999, that respondent had satisfied this showing, a conclusion upheld by the BIA in 2000, and not disputed by the INS in its submission to the Attorney General in 2001, where it stated:  "At this time, the Service does not oppose the Immigration Court's grant of deferral of removal under [the regulations implementing the Convention Against Torture]."  However, for the reasons discussed above with respect to respondent's claim of a threat to his life or freedom, I will also reopen the threshold issue under the Convention Against Torture of whether respondent faces a likelihood of being tortured in Algeria, and I will remand that issue as well for further consideration, including further submissions from the State Department and the parties, as appropriate.

## III.  CONCLUSION

For the foregoing reasons, I conclude that respondent is excludable and I order him excluded.  I vacate the decision of the BIA and remand for further proceedings consistent with this opinion on respondent's eligibility for withholding of deportation and for deferral of removal to Algeria.  Respondent's application for asylum is denied as a matter of discretion.