Droney, Circuit Judge, concurring:
I agree that the material support for terrorism bar to asylum and withholding of removal does not contain a duress exception. I write separately to address whether the discretionary waiver to the material support bar complies with the obligations of the United States under international law, both in this case and more broadly. In my view, it is not clear that the waiver system meets these obligations without additional information from the Department of Homeland Security (DHS); indeed, I have serious concerns that it does not.
The United States is a signatory to the 1967 United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, T.I.A.S. 6577 (1968) ("the Protocol"), which re-incorporated the main provisions of the U.N. Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150. Under the Protocol, signatory states may not deport an otherwise-eligible refugee or asylee unless the state has "reasonable grounds for regarding [the refugee] as a danger to security of the country in which he is." Protocol art. 33.2. This "national security exception" places limits on expelling individuals who can otherwise establish their eligibility for asylum by showing that their "life or freedom would be threatened on account of ... race, religion, nationality, membership [in] a particular social group or political opinion" if returned to their country of origin. Id. art. 33.1. The government contends that the material support bar does not violate this restriction because the Protocol "did not define what constitutes a 'danger to the security of the country,' [and thus] it was left to Congress to set the parameters of that exclusion." Resp't Br. at 35. However, the treaty's language, as well as the statute and its legislative history, make clear that Congress did not intend to allow DHS to remove otherwise-eligible asylees who do not present genuine security threats to the United States-a description that seems very likely to apply to Hernandez, and perhaps, others like her.
First, the plain language and structure of the Protocol demonstrate that a state may expel only asylees who present true security threats to the United States. See Swarna v. Al-Awadi , 622 F.3d 123, 132 (2d Cir. 2010) ("In interpreting a treaty, it is well established that we begin with the text of the treaty and the context in which the written words are used." (alteration and internal quotation marks omitted) ). Specifically, the Protocol requires reasonable grounds to deem an individual a security threat. Protocol art. 33.2. The United Nations Handbook on Procedures and Criteria for Determining Refugee Status, which federal courts have often used to interpret the Protocol,[1] supports interpreting this clause to place significant restrictions on a signatory state's ability to deport otherwise-eligible asylees. See United Nations High Commissioner for Refugees *114 (UNHCR), Handbook on Procedures and Criteria for Determining Refugee Status ¶¶ 140-63 (Geneva 1979) ("the Handbook"). The Court's opinion here cites the Handbook to support its conclusion that the determination of refugee status is left to signatories to the Protocol, slip op. at 7, but elsewhere the Handbook also specifies the limited conditions under which states may deny refugee status or expel a refugee, see UNHCR Handbook ¶¶ 140-63. In specifying these conditions, the Handbook indicates that a signatory state may expel an otherwise-eligible asylee only where that individual presents a serious threat to the country's security. See also UNHCR, Background Note on the Application of the Exclusion Clauses: Article 1F of the 1951 Convention Relating to the Status of Refugees 5 (Geneva 2003) ("Article 33(2) has always been considered as a measure of last resort, ... justified by the exceptional threat posed by the individual-a threat such that it can only be countered by removing the person from the country of asylum."). The fact that the Protocol is not self-executing, see Yuen Jin v. Mukasey , 538 F.3d 143, 159 (2d Cir. 2008), does not mean that we may disregard the Protocol's language.[2]
Second, domestic case law and Congress's actions support this interpretation of the Protocol. As the Supreme Court has noted, the United States codified its obligations under the Protocol when Congress passed the 1980 Refugee Act. Sale v. Haitian Ctrs. Council, Inc. , 509 U.S. 155, 177-78, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993). Part of the Act incorporated Article 33.2's protection into U.S. law, using language virtually identical to that used in the Protocol. See 8 U.S.C. § 1231(b)(3)(B)(iv) (preventing a grant of withholding of removal where "there are reasonable grounds to believe that the alien is a danger to the security of the United States"). The Third Circuit has interpreted this "national security exception" to prevent removal unless there is probable cause to believe that an otherwise-eligible asylee poses an "actual" and "non-trivial" threat to national security. Yusupov v. Att'y Gen. , 518 F.3d 185, 201-04 (3d Cir. 2008) ; see also id. at 204 (noting that the language " 'danger to the security of the United States' includes an inherent seriousness requirement").[3]
The question is whether the discretionary waiver system, as currently implemented, satisfies this standard. On the one hand, there is some basis to conclude that the waiver approach meets the Protocol's requirements and that Congress exercises meaningful oversight over the system to *115 ensure compliance with its purpose and U.S. treaty obligations. In 2005, Congress amended the bar for "engaging in terrorist activities" to allow the Secretary of DHS to waive the bar in his or her sole discretion. See Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005, Pub. L. No. 109-13, § 104, 119 Stat. 231, 309 (codified at 8 U.S.C. § 1182(d)(3)(B) ). As part of that law, Congress mandated that the Secretary report to certain congressional committees regarding how frequently DHS invoked the discretionary authority. 8 U.S.C. § 1182(d)(3)(B)(ii). Using this authority, the Secretary created a waiver system for certain individuals who provided material support under duress. See, e.g. , Exercise of Auth. under Sec. 212(d)(3)(B)(i) of the Immigration and Nationality Act, 72 Fed. Reg. 26138-02 (May 8, 2007). In December 2007, Congress enacted additional reporting requirements regarding discretionary waivers for duress cases. See Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, § 691(e), 121 Stat. 1844, 2365. Congress acted in 2007 after many refugee and asylee advocates (as well as members of Congress) voiced concern about the implementation of the 2005 waiver authority and the material support bar's unfortunate consequences in many cases. See The "Material Support" Bar: Denying Refuge to the Persecuted?": Hearing before the Subcomm. on Human Rights & the Law, Senate Comm. on the Judiciary , 110th Cong. 1-186 (Sept. 19, 2007).
However, the facts of this case, the nature of the discretionary waiver process, and the limited public information available regarding the waiver prevent me from concluding that the waiver system necessarily complies with the Protocol; indeed, these issues leave me with serious concerns that at least in some cases, the waiver system does not comply with our treaty obligations and Congress's intent to create an effective waiver system. First, the record in Hernandez's case does not suggest that the United States faces an actual threat from this asylum applicant. There is no dispute that Hernandez was a "successful businesswoman" in Colombia who provided food to members of FARC[4] every three months for a period of two years following a series of FARC threats against her. Matter of M-H-Z , 26 I. & N. Dec. 757, 758 (2016). However, in early 1999, Hernandez stopped providing assistance to FARC, and instead housed Colombian police officers in her hotel. Appellate Record 96. FARC once again began threatening Hernandez, and in March 2000, they attacked her hometown, burning down Hernandez's store and hotel. Id. Hernandez was later taken to see a FARC commander, who pointed a gun at her head, threatened her family, and ordered her to stop assisting "the police and politicians in her town." Id. at 97. After continuing to receive threats, Hernandez fled Colombia for the United States in 2001. Id. The U.S. government placed her in removal proceedings, and eventually, the immigration judge-following a full, contested hearing-determined "that, but for the material support bar, [Hernandez] would be eligible for asylum based on her past persecution by the FARC." 26 I. & N. Dec. at 759 ; Appellate Record 203.
Nothing about this undisputed history suggests that Hernandez is a security *116 threat to this country. Indeed, DHS did not deny Hernandez a waiver on security grounds or express doubt that she had acted under duress. Rather, DHS denied her a waiver only because she failed to "fully disclose, in all relevant applications and interviews with U.S. Government representatives and agents, the nature and circumstances of each provision of material support." Pet'r Br. at 50, No. 11-31 (2d Cir.), ECF No. 90. This failure to disclose violated the DHS-created "threshold requirement" that a waiver applicant disclose certain information about the material support she provided in order to be eligible for a waiver. See 72 Fed. Reg. at 26138. Yet as I detailed above, under the Protocol, the United States may only deport an asylee based upon the security threat she presents to this country.[5]
This leads me to my second concern. In my view, the fact of Hernandez's denial-after the immigration judge determined that she was likely to face persecution if returned to Colombia-raises serious concerns that the discretionary waiver process is not effective given the few protections that the waiver process provides. See Islam v. Gonzales , 469 F.3d 53, 55 (2d Cir. 2006) (detailing procedural protections in formal removal proceedings). It may well be that a discretionary waiver system and its lack of administrative or judicial review best balances the need for our Executive Branch to safeguard national security while ensuring that some applicants who do not present a genuine security risk may obtain asylum and withholding of removal. For example, some cases might involve sensitive information about terrorist organizations such as ISIS that pose (or have posed) serious threats to U.S. national security. These cases may require secrecy of the waiver interviews and reasons for the waiver denials to protect sources or methods of overseas intelligence gathering. However, the need for such secrecy does not seem so clear in this case involving FARC, which has not presented a security threat to the United States for quite some time, if ever.[6] As Hernandez's experience seems to suggest, in practice this discretionary waiver system also allows DHS to make its own credibility determinations, without the protections afforded in removal proceedings before the immigration court. See 72 Fed. Reg. at 26138; see also Burger v. Gonzales , 498 F.3d 131, 134-35 (2d Cir. 2007) (noting procedural protections in asylum and withholding of removal).
DHS's regulations and the limited information available on the waiver process underscore these procedural concerns. As mentioned above, to obtain the waiver, an applicant must "[p]ose[ ] no danger to the safety and security of the United States." 72 Fed. Reg. at 26138. This requirement essentially concedes that many individuals to whom the material support bar applies are not an "actual" and "non-trivial" threat *117 to U.S. national security. Yusupov , 518 F.3d at 201-04. Absent a grant of a discretionary waiver, denying these non-dangerous applicants asylum or withholding would violate the terms of the Protocol (so long as there are no other grounds for denial). See id. ; Protocol Art. 33.2. Furthermore, the current waiver process does not appear to provide a "full and fair opportunity [for an applicant] to present her claims" or to respond to the government's reasons for denying the waiver. Burger , 498 F.3d at 134. An agency memorandum providing internal guidance to the agency provides some structure to this process, but also suggests that the applicant's only participation in the waiver process takes place in an interview focused on the details of the applicant's material support. See Memorandum of Jonathan Scharfen, Deputy Director, to DHS Officials (May 24, 2007), https://hsdl.hsdl.org/?view&did=21273.
Finally, the limited public statistics available to evaluate the waiver system further underscore my concerns and those of the panel in Ay v. Holder , 743 F.3d 317, 321 (2d Cir. 2014). For example, in fiscal year 2014-the only year with publicly available data-DHS processed only nineteen waivers for asylum applicants in the United States.[7] U.S. Citizenship & Immig. Servs., Report on the Secretary's Application of the Discretionary Authority Contained in Sec. 212(d)(3)(B)(i) of the INA 2 (2015).[8] Of these, DHS provided only four waivers for material support provided under duress to Tier I or Tier II terrorist organizations-the category into which FARC falls. Without more information (e.g., how many individuals in asylum proceedings DHS considers each year for a waiver), these results are difficult to assess. Nevertheless, the fact that DHS awards few waivers for asylum cases raises concerns that the process may be inadequate to comply with the Protocol. In light of each of these concerns, I join the other members of this Court who have observed that "the relief that [the discretionary] waiver offers appears to be limited," Ay , 743 F.3d at 321 ; indeed, it is possible that the relief may be so limited that it does not comply with the Protocol in certain cases.
Nothing in this case suggests that Hernandez represents a genuine threat to U.S. national security. Perhaps DHS has information demonstrating otherwise, and perhaps the waiver system ensures compliance with international law in every case. Courts would need additional information to reach the conclusion that the material support bar complies with the Protocol's requirements. Here, all the administrative record reflects is a Colombian businesswoman who acted under extreme fear and duress to protect her life and her family's life by providing foodstuffs to a guerilla organization located only in the highlands of Colombia. This same woman also assisted the Colombian police, the very people FARC often targeted. Indeed, DHS's denial of Hernandez's waiver did not even suggest she is an actual security threat. If she is in fact not a threat, then I would urge the government to reconsider Hernandez's denial-to ensure that this case and others comply with the U.S.'s international obligations under the Protocol.

See INS v. Cardoza-Fonseca , 480 U.S. 421, 438-39, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) ("In interpreting the Protocol's definition of 'refugee' we are further guided by the analysis set forth in the Office of the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status (Geneva 1979).); I.N.S. v. Aguirre-Aguirre , 526 U.S. 415, 427, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999) (consulting Handbook to interpret Protocol).

While the Protocol may permit states to determine how to implement its terms, the Protocol's text establishes a baseline for what constitutes a security risk serious enough to justify denying asylum to an otherwise-eligible applicant. Thus, this Court should look to these words in resolving the issues raised by this case. See Murray v. Schooner Charming Betsy , 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804) ("[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains ...."). Indeed, the Supreme Court has consulted the Protocol's text on various occasions to help interpret the meaning of the U.S.'s asylum and withholding of removal law. See, e.g. , Sale v. Haitian Ctrs. Council, Inc. , 509 U.S. 155, 179-87, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993) ; Cardoza-Fonseca , 480 U.S. at 438-39, 107 S.Ct. 1207.

Yusupov involved review of a case from the Attorney General that interpreted 8 U.S.C. § 1231(b)(3)(B)(iv). Matter of A-H- , 23 I. & N. Dec. 774 (2005). In that case, the Attorney General had similarly concluded that this section requires probable cause to believe that an individual may pose a non-trivial threat to national security. Id. at 788-89. Applying Chevron deference, the Third Circuit differed from the Attorney General only in that the Court determined an asylee must "actually pose a danger to the United States." Yusupov , 518 F.3d at 201 (emphasis added).

FARC is the Spanish acronym for the Revolutionary Armed Forces of Colombia, a guerilla organization at the center of Colombia's internal conflict for decades. See June S. Beittel, Cong. Research Serv., RL 43813, Colombia: Background and U.S. Relations , 2-8 (2017). FARC and the Colombian government signed a peace accord in 2016, under which FARC has disarmed. Id. at 11, 13-15. However, these very recent developments occurred after the administrative record in this case was developed. See 8 U.S.C. § 1252(b)(4).

Significantly, Hernandez is not alone, which increases my concerns. In the Third Circuit case addressing this issue, DHS denied a waiver to an individual who provided material support under duress to a rebel group in Sierra Leone by moving the group's equipment and goods. Sesay v. Att'y Gen. , 787 F.3d 215, 217-18 (3d Cir. 2015) ; id. at 223 n.7. The individual provided this support after repeatedly refusing to join the group as a rebel and after imprisonment and repeated beatings. Id. at 218. Similarly, in the Fourth Circuit's case addressing this issue, an asylum applicant permitted FMLN guerillas in El Salvador to use his house for cooking after the FMLN previously killed the applicant's father and cousin. Barahona v. Holder , 691 F.3d 349, 351-52 (4th Cir. 2012). DHS also denied a waiver in that case. Id. at 355 n.8.

See Beittel, Colombia: Background and U.S. Relations at 2-8, 11, 13-15 (summarizing the history of Colombia's internal conflicts and recent developments).

Many more waivers were processed for refugees outside the United States.

At oral argument, the government indicated that this report-which only contains information on the number of waivers granted-was not originally intended to be publicly available. According to the government, an outside organization obtained and released a copy of the report. The report is now available on the Internet.