# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SAM MALKANDI, a.k.a. Sarbarz
Abulgani Mohammad,
            *Petitioner-Appellant,*

v.

MICHAEL B. MUKASEY, Attorney
General,

            *Respondent-Appellee.*

No. 06-73491

Agency No.
A75-043-854

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
April 9, 2008—Seattle, Washington

Filed September 19, 2008

Before: Stephen Reinhardt, A. Wallace Tashima, and
M. Margaret McKeown, Circuit Judges.

Opinion by Judge McKeown

## COUNSEL

Frederic C. Tausend and Shaakirrah R. Sanders, Kirkpatrick & Lockhart Preston Gates Ellis, LLP, Seattle, Washington, for the petitioner-appellant.

Peter D. Keisler, Assistant Attorney General, Michael P. Lindemann, Assistant Director, William C. Peachey, Senior Litigation Counsel, Office of Immigration Litigation, Washington, D.C., for the respondent-appellee.

---

## OPINION

McKeown, Circuit Judge:

This case focuses on the interplay between credibility findings under the REAL ID Act of 2005 and the government's determination that "there are reasonable grounds for regarding petitioner Sam Malkandi as a danger to national security." Malkandi, an Iraqi Kurd who has lived in the United States since 1998, was granted permanent residence in 2000. He was placed in removal proceedings, however, when it was revealed that he lied to gain refugee status while in Pakistan and maintained these misrepresentations throughout the naturalization process, despite opportunities to correct them. An apostate of Islam, Malkandi feared returning to Iraq, so he applied for asylum, withholding from removal and relief under the Convention Against Torture ("CAT"), but was determined to be ineligible because he was found to be a threat to national security.

This adverse national security finding was supported by Malkandi's own admissions plus testimony and documentation from government officials, who alleged that Malkandi served as a "travel facilitator" for one Salah Mohammed, a.k.a. "Khallad." Khallad is a notorious al Qaeda operative whom the intelligence establishment believes was involved in several of al Qaeda's most infamous attacks against U.S. interests overseas and was also connected to the alleged architect of the attacks of September 11, 2001. The Immigration Judge ("IJ") found Malkandi not credible, a finding which was upheld by the Board of Immigration Appeals ("BIA")

and ultimately undermines Malkandi's arguments that the evidence "compels us" to accept his innocuous explanations for his association with Khallad. Malkandi's lack of credibility, coupled with concrete evidence about his associations, convinced the IJ and BIA that the government had met its burden of showing that it had "reasonable grounds" to regard him as "a danger to national security." Under the national security bar to withholding of removal and deferral of removal under the CAT, Malkandi needed to "prov[e] by a preponderance of the evidence that such grounds do not apply," 8 C.F.R. § 1208.16(d)(2), which he failed to do.

To prevail on his petition for review, Malkandi must do more than just poke holes in the government's case against him, but rather, must "compel" us to see the facts his way. *See Tawadrus v. Ashcroft*, 364 F.3d 1099, 1102 (9th Cir. 2004) (holding that under 8 U.S.C. § 1252(b)(4)(B), the BIA's findings of fact are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."); *see also INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992). Adverse credibility determinations are reviewed under the same substantial evidence standard as findings of fact. *See Gui v. INS*, 280 F.3d 1217, 1225 (9th Cir. 2002). Because substantial evidence supports the BIA's credibility determination, and Malkandi has not met his burden to defeat the national security finding, Malkandi's petition for relief is denied.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   LIFE IN IRAQ AND IRAN

Malkandi was born in Sulaimaniya, Iraqi Kurdistan, in 1958 and given the name Sarbarz Abulgani Mohammad. He entered the University of Bagdad in 1978 and married in his last year of study. With the escalation of the Iran-Iraq war, Malkandi was conscripted into the Iraqi army. But when in the mid-1980s he was ordered to report to an active military unit, he deserted the army and returned to his hometown,

where he remained for a year until learning that the army was planning a sweep for deserters.

Malkandi hails from a prominent family in his hometown and used family connections to arrange to flee to Iran with his wife. There they met up with the *peshmerga*, who were at the time Iran's allies in its war with Iraq. The *peshmerga* helped Malkandi settle in Iran, where his first wife later gave birth to his daughter. Near the end of the Iran-Iraq war, Malkandi's wife committed suicide, prompting Malkandi to leave Iran with his daughter.

Due to his deserter status, Malkandi feared returning to Iraq, so he arranged to be smuggled into Pakistan, where he and his daughter lived in refugee camps. Malkandi used cassette tapes to communicate with family members and friends, who can be heard on the tapes referring to him by his nickname, Barzan. While in Pakistan, Malkandi met Mali, his current wife, who gave birth to their son.

On October 3, 1997, Malkandi applied for refugee status with the United Nations High Commissioner for Refugees ("UNHCR") in Islamabad, submitting a "Sworn Statement of Refugee Applying for Entry into the United States" and a "Registration for Classification as a Refugee" form. UNHCR officials testified at Malkandi's removal proceedings that his mere status as a deserter would likely not have been enough to earn him and his family refugee status for purposes of entering the United States. Malkandi had been advised as much through rumor in the refugee camps, and so he presented the UNHCR with a more dramatic and sympathetic version of his personal history, embellishing and in some respects completely fabricating the circumstances of his role in the Iraqi army, his flight to Iran, and the persecution he and his wife faced in Iran. Malkandi swore to the veracity of this account in his statements to UNHCR and declined to denounce this false history numerous times during his naturalization proceedings in the United States.

Malkandi told a UNHCR officer that he served in the Iraqi army from 1984 to 1987, and, after completing this service, had joined the Revolutionary Banner Movement Party. He bragged that he served as a cell leader responsible for educating and training people for the Banner movement's activities. Malkandi also claimed that he was prompted to flee to Iran in November 1987, when Iraqi forces arrested one of the five members of the cell that he led. According to Malkandi's story, while searching him at a border checkpoint, Iranian soldiers found religious and political books in his custody, so they arrested him and then imprisoned him on suspicion of being a member of Komola (an Iranian Kurdish group), and also of being an Iraqi Communist Party spy. Malkdani also told UNHCR officials that during his one-year imprisonment, the authorities questioned his spouse three times, and due to the stress, she committed suicide by setting herself on fire.

## B.  NATURALIZATION PROCEEDINGS

Malkandi was granted refugee status and entered the United States with his family in June 1998. After a brief stop in Texas, the family moved to the Seattle area. In 1999, Malkandi applied for permanent residence. On his application, Malkandi, under penalty of perjury, indicated that he had never sought to procure immigration benefits by fraud or misrepresentation. Malkandi was granted lawful permanent residency in November 2000. In January 2001, he legally adopted the Americanized name, Sam Malkandi, and changed the names of his wife and children as well. In Malkandi's 2003 Application for Naturalization, he again stated under penalty of perjury that he had never lied to any United States official to gain entry or admission into the United States. In his follow-up interview in January 2004, Malkandi did not correct any of his prior misrepresentations.

At some point while Malkandi's naturalization application was pending, burgeoning evidence appeared to implicate connections between him and al Qaeda. Two FBI agents made an

initial inquiry into these connections in a series of interviews with Malkandi in late September 2004. It was during these interviews that Malkandi first admitted to having lied to the UNHCR in order to gain refugee status.

The FBI questioned Malkandi about a letter allegedly sent to his home regarding a medical appointment for a man named Salah Mohammed. The letter, dated April 9, 1999, is addressed to Salah Mohammed in care of Sarbarz Mohammad (Malkandi's given name). It confirms the appointment at a Bellevue, Washington prosthetics clinic called NovaCare. A handwritten sticky-note on the letter states that Sarbarz called to confirm the appointment and check the costs of the operation. In addition to reflecting that Salah Mohammed was a "no show," the note says that "Sarbarz Mohammad needed a letter for Mr. Salah Mohammed in Yemen, [ ], his embassy needs to know he has an appt. here." Special Agent James Donovan obtained a copy of the letter from NovaCare's files.

On the initial day of interviews with the FBI, Malkandi denied any knowledge of the letter or of Salah Mohammed. The next day, however, Malkandi corrected himself, stating that his wife reminded him that he had by "coincidence" met a man from Yemen named Ahmed Bawareth, who was in Seattle on vacation. Over the course of their acquaintance, Bawareth asked Malkandi if he could use his address as a point of contact, so that Bawareth could make a medical appointment for an overseas friend, Salah Mohammed, who was in need of a prosthetic leg.[1]

Malkandi also told the FBI that he later received a phone call from abroad that he believes was placed by Salah Mohammed from "somewhere in the Middle East." During the call, Malkandi relayed the price quoted to him by Nova-Care and the telephone caller said it was "very expensive."

---

[1]Salah Mohammed, a.k.a., Khallad, lost his leg in Afghanistan participating in the battle against the Northern Alliance.

According to Malkandi, the caller referred to him as "Barzan." Malkandi claims to have discontinued his acquaintance with Bawareth soon after this call. Special Agent Darrick Smalley, an Immigration and Customs Enforcement ("ICE") officer assigned to the Joint Terrorism Task Force, testified that he conducted a record check of immigration files and could not find proof that a man named Ahmed Bawareth had ever entered the United States.

## C.  MALKANDI'S LINKS TO KHALLAD AND AL QAEDA

The government's suspicions of Malkandi came to a head on August 25, 2005, when Malkandi came to the FBI's Seattle offices to retrieve a computer he had voluntarily turned over for examination. On that day, several agents of the Joint Terrorism Task Force confronted him regarding information released in the 9/11 Commission Report. The Task Force believed that the report linked him with Salah Saeed Mohammed bin Yousaf (a.k.a. "Khallad"[2]), an al Qaeda operative who directed the attacks on the American embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania, was a participant in the attack on the USS Cole, and was trained by Khallad Sheikh Mohammed, the principal architect of the 9/11 attacks. *See* THE 9/11 COMMISSION REPORT: FINAL REPORT OF THE NATIONAL COMMISSION ON TERRORIST ATTACKS UPON THE UNITED STATES 492 n.44 (2004) ("9/11 Report") ("[a]ccording to the CIA, 'Barzan' [Malkandi's nickname] is possibly identifiable with Sarbarz Mohammad, the person who resided at the address in Bothell, Washington, that Khallad had listed on his visa application as his final destination.") (citing "Intelligence report, interrogation of Khallad, Aug. 20, 2003).

---

[2]The government's brief before the BIA notes that "Khallad's name appears as Tafiq Muhammed Saleh bin Roshayd bin Attash on page 5 of the indictment filed in *United States v. Al-Badawi and Al-Quso* in the U.S. District Court, Southern District of New York." Much of the information about Khallad presented by the government in this case comes from interrogations of Khallad, who was captured in 2003 and remains in U.S. custody.

Special Agent Smalley showed segments of the 9/11 Report to Malkandi as well as photographs of Khallad and another individual related to the plot to bring Khallad to the United States. Malkandi denied knowing either individual and, according to Smalley, "became verbally combative," in response to this line of questioning, protesting that he had already answered these questions with the FBI.

Smalley then asked Malkandi to read some excerpts from the report, including footnote 44, which summarized the information obtained from Khallad's interrogations. Apparently, Malkandi's demeanor changed abruptly when he came to the portion of the report where Khallad identifies his point of contact in the U.S. as someone named "something like 'Barzan.'" According to Agent Smalley's testimony, when Malkandi read this section, his "attitude of being combative stopped," and "[h]e became, well, he said uh-oh . . . . And his total demeanor changed from that point forward."

Agent Smalley testified that once he saw that Malkandi would not cooperate further without the presence of an attorney, he served Malkandi with the denial of his naturalization application, a Notice to Appear at removal proceedings, an arrest warrant for immigration fraud, and a bond determination. He then placed Malkandi under arrest. The Notice to Appear stated that pursuant to INA § 237(a)(1)(A), 8 U.S.C. § 1227(a)(1)(A), Malkandi was subject to removal because he was charged as inadmissible at time of entry under INA § 212(a)(6)(C)(I) for having sought to procure immigration benefits "by fraud or by willfully misrepresenting a material fact." Malkandi does not dispute that he is removable on this basis. Malkandi later submitted an application for asylum, withholding from removal, and protection under the CAT, and also requested release on bond, which was denied in November 2005. Malkandi has remained in detention since his arrest.

## D.   REMOVAL PROCEEDINGS AND THE BIA Appeal

Proceedings on the removal charge took place in November 2005, followed by hearings on Malkandi's asylum and with-

holding applications in January and February 2006. The IJ issued his decision on February 11, 2006, finding Malkandi not credible and removable as charged because he "knowingly made material false representations to induce the United States Government to approve [the family's] admission into the United States as refugees." The IJ also determined that Malkandi was statutorily ineligible for asylum, withholding from removal or protection under CAT because there are "reasonable grounds to regard" Malkandi "as a danger to national security." *See* INA § 208(b)(2)(A)(iv), 8 U.S.C. § 1158(b)(2)(A)(iv) (exception to grant of asylum); INA § 241(b)(3)(B)(iv), 8 U.S.C. § 1231(b)(3)(B)(iv) (exception to withholding from removal); 8 C.F.R. § 1208.16(1)(2) (exception to CAT withholding); *see also Bellout v. Ashcroft*, 363 F.3d 975, 979 (9th Cir. 2004) ("an alien is ineligible for asylum if the Attorney General decides that there are reasonable grounds for regarding the alien as a danger to the security of the United States *or* that the alien is inadmissible or removable for terrorist activity. Either ground will support the IJ's denial of asylum."). This finding was based on the IJ's reading of our case law in *Cheema v. Ashcroft*, 383 F.3d 848, 856 (9th Cir. 2004), where we held that an alien poses a danger to the security of the United States where he acts "in a way which 1) endangers the lives, property, or welfare of United States citizens; 2) compromises the national defense of the United States; or 3) materially damages the foreign relations or economic interests of the United States."

The IJ rejected, however, the government's contention that Malkandi had "engaged in terrorist activities," a more serious charge requiring more specific proof. He noted specifically that Malkandi's "association with" Khallad did not "rise[ ] to the level of material support." *See* INA § 241(a)(4)(B), 8 U.S.C. § 1182(a)(3)(B)(iv)(VI), (rendering deportable any alien who has "engaged, is engaged, or at any time after entry engages in any terrorist activity (as defined in § 212(a)(3)(B)(iv)."). The IJ observed that "a finding to the contrary would . . . defy the plain language of INA Section

212(a)(3)(B)(iv)." The IJ further held that he would also deny Malkandi relief as a matter of discretion based on Malkandi's "personal efforts" that the IJ found posed a danger to national security.

Having found Malkandi statutorily ineligible for relief, the IJ denied Malkandi's applications and ordered him removed to Iraq. Malkandi's wife and two children also applied for asylum, which the IJ independently reviewed and granted. Because of Malkandi's statutory ineligibility, the IJ also denied Malkandi's potential derivative status from the grant of asylum to his family members.

The BIA upheld the IJ's adverse credibility finding and concluded that the evidence was "sufficient to support a finding that there are reasonable grounds for regarding [Malkandi] as a danger to the security of the United States, and he is therefore statutorily ineligible for asylum and withholding of removal."[3] The "decision that an alien has not established eligibility for asylum or withholding of removal is reviewed for substantial evidence." *Zehatye v. Gonzales*, 453 F.3d 1182, 1184-85 (9th Cir. 2006). Under the substantial evidence standard, "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). Thus, we must uphold the IJ's determination if it is supported by reasonable, substantial, and probative evidence in the record. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992); *Valderrama v. INS*, 260 F.3d 1083, 1085 (9th Cir. 2001) (per curiam) (adverse credibility determinations reviewed for substantial evidence).

## II.  DISCUSSION

As the parties have acknowledged, the core facts that form

---

[3]Because the BIA concluded that Malkandi is statutorily ineligible for asylum and withholding of removal, it did not address denial of asylum as a matter of discretion or on a derivative basis.

the basis for the government's suspicion of Malkandi are not in dispute. What is hotly disputed is the interpretation of these events—one alarming and one innocuous—and some of the details surrounding these facts. Malkandi claims that these random loose pieces do not combine to form a complete picture proving that he poses a danger to the security of the United States, and that there is a perfectly innocent explanation of his actions, namely, that he was doing a favor for an acquaintance. More pointedly, Malkandi notes that the government has presented no evidence demonstrating that Malkandi *knew* with whom he was dealing, or to what ultimate end. The government counters that the BIA got it right: substantial evidence supports the conclusion that there are reasonable grounds to regard Malkandi as posing a danger to national security. The evidence reveals, the government claims, that Malkandi served as a travel facilitator for an al Qaeda operative and Malkandi's story of a chance meeting of Bawareth in a shopping center and casual participation in the clinic scheme strains credulity.

## A. THE NATIONAL SECURITY EXCEPTION TO ELIGIBILITY FOR ASYLUM AND WITHHOLDING FROM REMOVAL

### 1. The BIA applied the appropriate burden of proof

Before addressing the merits, we first consider the appropriate burden of proof with respect to the national security finding. Malkandi argues that the BIA applied the wrong standard ("sufficient suspicion") to its determination. We review de novo the question of burden of proof. *Taisho Marine & Fire Ins. Co., Ltd. v. M/V Sea-Land Endurance*, 815 F.2d 1270 (9th Cir. 1987).

[1] Under the relevant statutes, an alien is statutorily ineligible for asylum and barred from withholding of removal if there are "reasonable grounds for regarding the alien as a danger to national security." INA § 208(b)(2)(A)(iv), 8 U.S.C. § 1158(b)(2)(A)(iv); INA § 241(b)(3)(B)(iv), 8 U.S.C.

§ 1231(b)(3)(B)(iv). Likewise, CAT relief is unavailable if an applicant "falls within Section 241(b)(3)(B)." *Bellout*, 363 F.3d at 978 ("if the alien is barred from withholding of removal under § 1231(b)(3)(B)(iv), he is also barred from withholding of removal under CAT."). That bar to relief stands unless the applicant can show by a "preponderance of the evidence that such grounds do not apply." 8 C.F.R. § 1208.16(d)(2).

**[2]** The question then is what standard we use to benchmark "reasonable grounds." The BIA's decision relies heavily on the Attorney General's interpretation of the national security bar in *Matter of A-H-*, which equated the standard with "reasonable cause; sufficient cause; reasonable grounds" under the probable cause standard. *Matter of A-H-*, 23 I. & N. Dec. 774, 789 (2005). In *Matter of A-H-*, the Attorney General looked back to the First Circuit's decision in *Adams v. Baker*, 909 F.2d 643, 649 (1st Cir. 1990), in which the court held that the statutory reference to "reasonable" grounds "implies the use of a reasonable person standard." *Matter of A-H-*, 23 I. & N. Dec. at 788. This approach, the Attorney General concluded, was "consistent with the BIA's reliance on 'probable cause' cases." *Id.* The Attorney General faulted the BIA, however, for equating probable cause with a preponderance of the evidence standard, explaining that " 'reasonable grounds for regarding' is substantially less stringent than preponderance of the evidence." *Id.* at 789. Instead, he concluded, "[t]he 'reasonable grounds for regarding' standard is satisfied if there is information that would permit a reasonable person to believe that the alien *may* pose a danger to the national security" *Id.* (emphasis added).

**[3]** The Third Circuit has since upheld, under the *Chevron* doctrine, the Attorney General's invocation of the probable cause standard. *See Yusupov v. Ashcroft*, 518 F.3d 185, 200 (3d Cir. 2008); *see generally Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). While the Third Circuit in *Yusupov* resolved that equating the "reasonable

grounds" standard to one "akin to probable cause in criminal cases" is "reasonable," and thus "a permissible construction of the statute,"[4] it took issue with the "may pose" language of the Attorney General's interpretation. 518 F.3d at 201. According to the Third Circuit, this view "accords with neither the plain wording nor the ordinary meaning of the statutory text, which does not refer to belief in a mere possibility." *Id.* The court clarified that "is" and the subjunctive form "would" "connote a more certain determination than that the alien 'might' or 'could' be a danger." *Id.* (citing *INS v. Stevic*, 467 U.S. 407, 422 (1984) ("The section ['would be threatened'] literally provides for withholding of deportation only if the alien's life or freedom 'would' be threatened in the country to which he would be deported; it does not require withholding if the alien 'might' or 'could' be subject to persecution.")).

The court went on to explain that

> we must take the statute to mean what it says: "is" indicates that Congress intended this exception to apply to individuals who (under a reasonable belief standard) actually pose a danger to U.S. security. It did not intend this exception to cover aliens who conceivably could be such a danger or have the ability to pose such a danger (a category nearly anyone can fit).

*Id.* The bottom line in *Yusupov*, which we adopt, is that "reasonable" grounds should be evaluated against a reasonable person, probable cause standard and the alien must "actually" pose a "serious danger" to United States security.

---

[4]*Yusupov* also upheld the Attorney General's modification of the word "danger" with the word "serious," holding that "serious," just like the Attorney General's chosen phrase, "nontrivial level of a danger," while redundant, is "not unreasonable, even if this turns out to reflect an excess of caution to ensure that immigration judges do not consider nontrivial dangers" in applying the exception. *Yusupov*, 518 F.3d at 202-204.

**[4]** As in *Yusupov*, the question remains whether the BIA applied the appropriate burden to Malkandi's case. We conclude that it did. After a lengthy discussion, the BIA reiterated that the IJ "found that, based on the respondent's activities, there were reasonable grounds to conclude that the respondent *is* a danger to the security of the United States, a bar to asylum and withholding of removal" (emphasis added). The BIA then quotes the IJ's opinion, which also utilizes the appropriate, affirmative "is" language rather than the incorrect "may pose" standard.

**[5]** Malkandi seizes upon a single passing reference to "sufficient suspicion" and makes much of the difference separating belief and suspicion. But his argument takes this phrase out of context. The reference to "sufficient suspicion" came in response to Malkandi's objections to the IJ's reliance on certain pieces of evidence. In response, the BIA stated, "[w]e agree with the Immigration Judge's conclusion that the evidence *raised a sufficient suspicion* that the respondent should be regarded as a danger to the security of the United States." The opinion does not rest on that standard nor does it tie the evidence to that standard. Rather, the BIA cited *Matter of R-S-H-*, 23 I. & N. Dec. 629, 640 (BIA 2003), in which the Attorney General addressed this evidentiary issue and opined that information from an ongoing federal investigation and the respondent's ties to a terrorist organization were sufficient to " 'trigger concerns about the respondent and to establish 'reasonable grounds' under the Act.' " After addressing these evidentiary issues, the BIA then extensively quoted the Attorney General's explication of the "reasonable grounds for regarding" standard in *Matter of A-H-*, that we have approved.

**[6]** Malkandi overlooks the fact that in reaching its conclusion, the BIA cited and discussed the appropriate standard of review and the relevant case law, elaborated its meaning and related the standard to a probable cause burden. Unlike in *Yusupov*, we are confident that the BIA viewed the evidence in the proper light because of its explicit reliance on the clear

wording in the IJ's opinion. Taken in context, we conclude that the Board had the correct standard well in mind in arriving at its decision.

### 2.    Substantial evidence supports the finding that there are reasonable grounds for regarding Malkandi as a danger to the security of the United States

[7] The government's determination that there are reasonable grounds to regard Malkandi as a danger to national security stems from Malkandi's documented connection with al Qaeda and his role in facilitating medical documentation for Khallad (Salah Mohammed). The constellation of undisputed facts connects the dots between Khallad from the Middle East, Bawareth—a Yemeni go-between in Washington State —Malkandi, a facilitator in the Seattle suburb of Bothell, Washington, and a medical clinic near Seattle. The documentation, names, location, and timing are far too compelling to be written off as chance or coincidence.

During an interrogation, a confessed al Qaeda operative, Khallad, named his U.S. contact to be a man named Barzan— Malkandi's nickname. Khallad, who lost a leg during the Afghanistan conflict, matched perfectly the profile of the individual whom Malkandi admitted to helping get an appointment at NovaCare, a medical clinic located in Bellevue, Washington, which is near Bothell, the final destination listed on Khallad's visa application. Malkandi admitted not only to allowing Bawareth to use his name and address to secure the NovaCare appointment, but also to following up with Nova-Care to confirm the appointment. He also acknowledged receiving a call from somewhere in the Middle East from someone who asked to speak with Barzan regarding the NovaCare appointment. As bizarre as this subterfuge may seem, it is nonetheless internally consistent; Malkandi admits to all of the actions the government claims Barzan took. Though Malkandi may object that Barzan is a common Kurdish nickname, it is still his own name, no matter how much

he wanted to distance himself when the agents pointed out the excerpt from the 9/11 Report fingering Barzan as Khallad's U.S. contact.

The government's account also coheres with what Agent Marks testified to be al Qaeda's standard operating procedure for arranging their operatives' travel. He explained that

> [n]ormally, the al Qaeda organization is going to have a very small group of people, a handful, usually two or three, who are going to actually handle the documents, points of contact, travel, in order to fulfill the safe and secure movement of operatives around the world . . . . As far as contacts, they want somebody that they can trust on the other end.

When questioned as to whether he believed Malkandi was an al Qaeda travel facilitator, Special Agent Marks replied, "All the evidence that we have collected points to the fact that he was going to assist Khallad bin Attash into the United States and facilitate his stay here, yes."

**[8]** With this considerable evidence, the government has more than met its burden to establish "reasonable grounds" to determine that Malkandi is a danger to national security. Under the statute, however, this finding is not inviolate. The burden then shifts to Malkandi to demonstrate by a preponderance of the evidence that the national security grounds do not apply. *See* 8 C.F.R. § 1208.16(d)(2) ("If the evidence indicates the applicability of one or more of the grounds for denial of withholding enumerated in the Act, the applicant shall have the burden of proving by a preponderance of the evidence that such grounds do not apply.").

**[9]** In Malkandi's case, this burden is more than an uphill battle because he offers up no substantive evidence, only arguments to recast the meaning of the government's evidence. These explanations, however, are not compelling in

light of Malkandi's lack of credibility. It is inescapable that Malkandi's history of misrepresentations about his past and continued evasion of the truth casts a shadow over his present story. Though it cannot be overlooked that these statements were made initially in furtherance of his refugee status, he nonetheless spun quite a tale and continued to do so for a long time. Given his history, it is no surprise that the BIA discounted his improbable story of a chance meeting and a willingness to follow-up with a medical appointment for a perfect stranger. A pattern of misrepresentation has developed that cannot be ignored.

In response to the government's specific allegations, Malkandi points to several gaps in the government's evidence, which in the final analysis amount to no more than a skeptic's gloss on an otherwise coherent and reliable narrative. Malkandi first argues that some of the documents relied on by the government were not part of the administrative record. He then he points out that Salah Mohammed's visa application lists only "Bothell, WA," and not Malkandi's specific street address. Finally, Malkandi argues that the IJ and BIA improperly relied on the NovaCare letter.

**[10]** Malkandi complains that the underlying documentation from the 9/11 Report was not in the administrative record, thus undermining the evidence establishing his connections to Khallad. The 9/11 Report, which was akin to an expert report, was commissioned by Congress. The 9/11 Commission reviewed more than 2.5 millions pages of documents, interviewed more than 1,200 individuals, held 19 days of hearings and took public testimony from 160 witnesses. 9/11 Report at xv. Malkandi was confronted with specific evidence in the report and had fair notice of the evidence that linked him to terrorists. Nothing required the IJ to compel the introduction of the massive underlying documentation. We first note that immigration proceedings are "not bound by strict rules of evidence." *Espinoza v. INS*, 45 F3d 308, 310 (9th Cir. 1995) (citing *Baliza v. INS*, 498 F.2d 919, 921 (9th

Cir. 1974); *cf. Gu v. Gonzales*, 454 F.3d 1014, 1021 *(9th Cir. 2006) (holding that hearsay evidence is admissible if it is probative and its admission is fundamentally fair.) And, even in a traditional civil trial context where the evidentiary rules are in play, Federal Rule of Evidence 702 provides that "the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted." In light of the circumstances here, reference to the 9/11 Report was not fundamentally unfair, was not "intrinsically suspect," and nothing compelled the introduction of the underlying documentation. *See Matter of A-H*. 231 I. & N. Dec. at 789 (holding that evidence that is not "intrinsically suspect" may be relied upon to find reasonable grounds to believe someone is a threat to national security).

As to Malkandi's other arguments, the 9/11 Report's conclusion that the address in Salah Mohammed's visa application referred to Barzan's address, despite the lack of a specific street address, was not unreasonable. For the Yemeni to pick Bothell, Washington, out of an entire country of thousands of possible locations is precise enough, particularly in light of the other evidence linking the clinic letter to Salah Mohammed at Malkandi's address, and Khallad's naming his contact as Barzan, Malkandi's nickname.

**[11]** Malkandi tries to downplay the NovaCare letter on the ground that nothing really happened; he claims he never sent the letter anywhere and points out that Salah Mohammed did not keep the appointment. That all may be true, but it obscures what did happen and the documentation of the connection between Malkandi and Salah Mohammed—the letter was addressed to the home of Sarbarz Mohammad, Malkandi's given name, and the affixed sticky-note confirmed that Salah Mohammed needed the letter as proof of the appointment in order to satisfy immigration requirements. This letter was Salah Mohammed's key to the United States, whether or not it was ultimately submitted in support of his visa. Apart from challenging these perceived gaps in the evi-

dence, Malkandi's effort to overcome the national security finding is, at bottom, a challenge to the adverse credibility finding. We next turn to the basis for that finding.

### B.    SUBSTANTIAL EVIDENCE SUPPORTS THE ADVERSE CREDIBILITY DETERMINATION

Malkandi's credibility was at issue on multiple fronts—the saga he wove about his flight from Iraq, the improbability of his relationship with Bawareth, the inconsistencies in his story about making medical arrangements for Khallad, the inherent implausibility of that entire tale, as well as his evasive demeanor with investigating officers and while testifying. Ultimately, his credibility serves as a backdrop for evaluating the national security charge. Malkandi's "consistent falsehoods presented under oath," in the words of the BIA, were his undoing as the BIA discredited his portrayal of himself as an "innocent participant."

Under the REAL ID Act, in determining a petitioner's credibility, an IJ should "[c]onsider the totality of the circumstances, and all relevant factors," which may be based on:

> the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor.

8 U.S.C. § 1158(b)(1)(B)(iii), *as amended by* § 101(a)(3) of the REAL ID Act, Pub. L. No. 109-13, 119 Stat. 231, 303 (2005).

**[12]** The IJ must provide "specific and cogent reasons" in support of an adverse credibility determination. *He v. Ashcroft*, 328 F.3d 593, 595 (9th Cir. 2003). Once this criterion is met, we accord the credibility determination special deference. *See Malhi v. INS*, 336 F.3d 989, 993 (9th Cir. 2003). Under the substantial evidence standard, we may reverse a BIA credibility determination only if the evidence that the petitioner presented was "so compelling that no reasonable factfinder could find that [the petitioner] was not credible." *Farah v. Ashcroft*, 348 F.3d 1153, 1156 (9th Cir. 2003) (internal quotation marks omitted). "Where . . . the BIA has reviewed the IJ's decision and incorporated portions of it as its own, we treat the incorporated parts of the IJ's decision as the BIA's." *Molina-Estrada v. INS*, 293 F.3d 1089, 1093 (9th Cir. 2002).

**[13]** Malkandi was caught in a lie of significant magnitude; he does not contest that he completely fabricated virtually his entire past in his statements to the UNHCR. Nor does he deny that he repeatedly passed up opportunities to correct these misstatements. The BIA was negatively impressed by Malkandi's subsequent perpetuation of these lies at each stage of the naturalization process.

**[14]** But these distant falsehoods were not the principal basis for the credibility ruling. Malkandi was far from forthcoming with government agents regarding his connections to Khallad: he initially denied knowledge of the NovaCare letter in his first meeting with the FBI, repeated similar denials when he was questioned by other members of the Special Task Force, and only gave some ground when the agents forced him to read in the 9/11 Report the extent of the intelligence community's knowledge of his links to al Qaeda.

Even once Malkandi moved past this absolute denial, his testimony before the IJ provided ample reasons to doubt his candor. The IJ found that, unlike other aspects of his testimony, at several points in his testimony about Khallad, Malkandi stated that he did not understand a question or did not know or could not recall particular pieces of information, even though the events at issue were far more recent than the long-past events he remembered with greater clarity. Specifically, he claimed not to recognize the name Salah Mohammed, the names of the people at NovaCare with whom he spoke, or the fact that he had received the NovaCare letter or other emails apparently sent by Khallad and later obtained by the FBI through a search of Malkandi's computer. The IJ observed that his demeanor during this portion of his testimony stood in sharp contrast to his demeanor in other aspects of his testimony.

**[15]** All in all, the story Malkandi told explaining his participation in the efforts to enable Khallad to enter the country was highly implausible. Under all the above circumstances, the IJ's credibility findings are supported by substantial evidence.

On appeal, Malkandi fails to dig himself out of this evidentiary hole, for which he has no one but himself to blame. He argues that the BIA's adverse credibility finding was not supported by "substantial evidence," raising five specific objections: (1) the BIA failed to consider the circumstances under which Malkandi provided the UNHCR with falsehoods; (2) the BIA failed to consider the corroborating evidence in support of his testimony about his knowledge of Khallad and the NovaCare letter; (3) the BIA mischaracterized his testimony as "evasive;" (4) the BIA showed excessive deference to the government witnesses in arriving at its determination; and (5) the BIA did not have support for discrediting sequential religious conversions. In sum, Malkandi claims the BIA failed to consider the totality of the circumstances and the factors enumerated in 8 U.S.C. § 1158(b)(1)(B)(iii). It is Malkandi, how-

ever, who is overlooking the totality of the evidence, as he quibbles instead with minor details that fail to undermine the BIA's credibility finding. Although under the REAL ID Act credibility findings no longer need to go "to the heart of the applicant's claim," 8 U.S.C. § 1158(b)(1)(B)(iii), the key bases for the adverse credibility finding in this case are central to Malkandi's application.

[16] As to the first issue, the BIA's opinion briefly acknowledged that Malkandi testified that he had been told that he would not qualify for refugee status with the UNHCR had he told the truth about his past. The BIA did not ignore this point. Nonetheless, the BIA fairly focused on the fact that Malkandi continued the representations long past this initial point of claimed necessity or utility.

[17] Malkandi also claims the BIA ignored corroborative evidence by inconsistently drawing upon the supporting documentation, relying only on those aspects that were supportive of the government's case while overlooking other portions that support Malkandi's view. Specifically, Malkandi claims that three pieces of corroborative evidence—elements of the 9/11 Report itself, his wife's testimony, and evidence from NovaCare—support his contention that his contact with Khallad was quite limited. The BIA considered all of this evidence but none of it changed the reality of Malkandi's contact with Khallad. These other bits of information do not conclusively undermine the government's allegations of Malkandi's role nor do they negate the specific findings of lack of credibility. At best, this merely puts a different spin on identical facts.

[18] Similarly, Malkandi's challenge to the BIA's characterization of his testimony regarding Khallad and the Nova-Care letter as "evasive," obscures a broader view of the evidence. This determination was not based on one furtive glance or vague conclusion but rather on detailed findings supported by concrete examples. *See Arulampalam v. Ashcroft*, 353 F.3d 679, 686 (9th Cir. 2003) (holding that an IJ's

demeanor-based negative credibility finding must specifically and cogently refer to the noncredible aspects of the applicant's demeanor). As noted, the IJ observed and documented a distinct contrast between Malkandi's testimony on this point and his other testimony. Other evidence in the record underscores that this evasiveness was not limited to Malkandi's time on the witness stand, but had been a constant theme throughout Malkandi's interactions with the government agents.

**[19]** We also cannot agree with Malkandi's view that the BIA showed excessive deference to the government's witnesses. Any such deference is not reflected in the record. Pointing to several gaps and statements made by the agents that he claims are unsupported by the record, Malkandi cites two cases, *Matter of Al-Jailani*, No. A7336983, 2004 WL 1739163 (BIA June 28, 2004) (unpublished) and *Cheema*, that resulted in favorable outcomes for the petitioners. *Matter of Al-Jailani* is hardly illuminating as it involved an unpublished bond decision, not an appeal reviewing a final order of removal.

Malkandi also posits that the terrorism connections to Kaur,[5] the female petitioner in *Cheema,* were just as tenuous as those alleged here. But unlike Malkandi, Kaur was found to be credible so we had little difficulty reversing the BIA's finding that she was a danger to national security because she had donated money on one or two occasions to Sikh widows and orphans through organizations that the government suspected of being tied to Sikh militants. *See Cheema*, 383 F.3d at 856-57.

Malkandi's reliance on *Cheema* gets things precisely backwards. The petitioner in *Cheema* was not deemed credible

---

[5]*Cheema* involved the applications of a husband, Harpal Singh Cheema, and his wife, Rajwinder Kaur. The "petitioner" referred to here is Kaur, the wife.

*because* the government's evidence provided only tenuous connections to terrorism; rather, the government's tenuous evidence was insufficient in part *because* the petitioner credibly provided an innocent explanation. To infer, as Malkandi asks us to do, that Malkandi is credible because the government has not produced a smoking gun would be circular.

[20] Finally, the BIA states in passing, "[w]e also note the respondent's allegiances and religious convictions appear to shift depending on his circumstances." The fact is that Malkandi has had a dynamic personal religious evolution (from Muslim to Baha'i to Mormon), but there is little evidence to support the BIA's doubts on this basis. This statement, which was made without further discussion, however, can hardly upend a credibility determination.

Whatever slight failings Malkani may perceive in the credibility analysis, they are surely not significant enough to defeat the adverse credibility finding.

## III. CONCLUSION

Ultimately, Malkandi's argument does nothing to undermine the substantial evidence presented against him. He simply retells the story with the same evidence but with a different theme and plot. Malkandi's burden is neither as low, nor is the government's burden quite as high, as Malkandi suggests.

The government had to show that there were "reasonable grounds," i.e., grounds akin to probable cause, for believing that Malkandi posed a danger to the United States. The IJ's adverse credibility finding, which was supported by multiple, substantial references in the record, coupled with concrete evidence of Malkandi's contacts with terrorists led the IJ to find Malkandi removable. After careful analysis of the IJ's findings, the BIA wrote that the IJ "considered appropriate factors" in weighing the national security finding and that

"[t]hese factors are sufficient to support a finding that there are reasonable grounds for regarding the respondent as a danger to the security of the United States." For judicial review, reversal of the BIA's determination is warranted only if "any reasonable adjudicator would be compelled to conclude to the contrary." *Tawadrus*, 364 F.3d at 1102 (quoting 8 U.S.C. § 1252(b)(4)(B)). Because the evidence does not compel such a conclusion, the petition for review is **DENIED.**